MATILDA M. CLEMENS, Appellee, *vs.* THERESA M. CRANE, Admx., Appellant.

*Opinion filed April 23, 1908—Rehearing denied June 3, 1908.*

1. APPEALS AND ERRORS—*the Supreme Court may review facts in matter of probate court's adjustment of claim.* In the matter of adjusting claims against an estate the probate court exercises an equitable jurisdiction and may resort to equitable procedure, and the Supreme Court, upon review of such case, will examine both questions of law and of fact.

2. USURY—*what is necessary to constitute usury.* To constitute usury, in contemplation of law, there must be a loan or forbearance of money, or something circulating as money, which is repayable absolutely and at all events, and for the use of which something is exacted in addition to the interest allowed by law.

3. SAME—*the intention of parties may be considered with other facts and circumstances.* In determining whether the essential elements of usury are present in a particular case, the intention of the parties, as the same appears from the facts and circumstances of the case, may be considered in connection with other evidence.

4. SAME—*the form of contract is not conclusive of question of usury.* The form of the contract is not conclusive of the question of usury, and resort to extrinsic evidence may be had without regard to whether there is any ambiguity in the contract, for the reason that the charge of usury raises a question of the legality of the transaction to the extent that usury, under the statute, renders contracts illegal and void.

5. SAME—*the correspondence of parties is competent evidence where usury is claimed.* Where usury is set up by an administratrix to defeat a claim against the estate for money of the claimant advanced to the deceased, all of the correspondence and dealings between the parties with reference to the transaction is proper evidence to be considered.

6. SAME—*when a transaction will not be held to be usurious.* Where a person advances money to another in good faith and with the full belief that the latter is to invest it in his business and that they are to become partners in sharing the profits, which the latter guarantees will not fall below fifteen per cent per annum on the investment, the fact that the latter secretly uses the money for purposes outside of his business, although he continues, ostensibly, to account to the former for her share of the profits, does not convert the partnership transaction into an usurious loan.

SCOTT, FARMER and DUNN, JJ., dissenting.

APPEAL, from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

Matilda M. Clemens filed a claim in the probate court of Cook county against the estate of Gustav A. Bode for $7000, which that court disallowed. The claimant appealed to the circuit court, and upon a hearing before that court without a jury the full amount of the claim was allowed and judgment rendered against the estate, to be paid in due course of administration. Theresa M. Crane, administratrix of Gustav A. Bode's estate, took an appeal to the Appellate Court for the First District. That court affirmed the judgment of the circuit court. The administratrix by her further appeal has brought the record to this court for review.

The evidence introduced consists of a written instrument executed January 2, 1893, and certain supplementary agreements endorsed thereon, together with a number of letters between appellee and Gustav Bode. The nature of the questions involved is such that we deem it necessary to set out in detail the correspondence between the parties to the transactions out of which this litigation grows. Before doing so, however, a brief statement of some of the facts will throw some light on the written evidence hereinafter set out.

Prior to the year 1890 the husband of appellee appears to have been engaged in the manufacture of soda water, cider, ginger ale and other non-intoxicating drinks. Gustav A. Bode at that time, and subsequent thereto, was a manufacturer of extracts. A very close and sincere friendship existed between Bode and Clemens, and their families were likewise intimately acquainted. About the year 1890 Bode and Clemens appear to have had under consideration the formation of a partnership between them. Clemens died

in 1890 and no partnership agreement was entered into between them. After attempting to continue the business of her husband for a year or more after his death, the appellee sold the business and her home for $7000. Before making this sale Bode and appellee had discussed the advisability of her selling out her business and investing it in the extract business with Mr. Bode. In February, 1891, appellee, in pursuance of a verbal understanding with Bode, sent him $1000, and soon afterwards sent him $1100 more, and in November, 1892, she sent $4550 additional, and a little later $350 more, making a total of $7000. This amount was subsequently raised to $7777, $777 of which was afterwards returned to appellee, leaving the net amount of $7000 in the hands of Bode. He remitted appellee $75 per month regularly until February 24, 1901. Bode died February 27, 1901. He paid the appellee at the end of each year about eighteen per cent on the amount of money due appellee, less the monthly payment of $75. The aggregate amount of payments made by Bode to appellee exceeded the principal sum in his hands belonging to her.

The defense interposed by appellant to appellee's claim is that the contract is usurious and that the several payments made were payments of usurious interest, which being applied to the principal sum extinguished it, leaving nothing due. The appellee contends that she invested her money in Bode's business for a share of the profits and that she became a partner in the profits of his business, and that all payments made were on account of her share in such profits, and that therefore the whole of the principal sum is still due her.

The contract upon which appellee's claim is based is as follows:

"This agreement, entered into this second day of January, 1893, by and between Gustav A. Bode and Mrs. M. M. Clemens, to-wit: 'The said Gustav A. Bode agrees to accept from Mrs. M. M. Clemens the sum of six (6) thousand dollars ($6000), on which the said G. A. Bode agrees and guarantees a net profit to the said Mrs.

M. M. Clemens of not less than fifteen per cent per annum, said interest or profit to be paid between January 5 and 15 of each year, less $900, which $900 will be mailed to Mrs. M. M. Clemens in monthly lots of $75 per month, or $900 in twelve months. It is further agreed that $3000 shall be paid back to Mrs. M. M. Clemens or her heirs in five years from this date, January 2, 1893, and the remaining $3000 in eight years from this date, January 2, 1893. In the event of the death of the said Gustav A. Bode the said Mrs. M. M. Clemens agrees to surrender this instrument to the widow of the said Gustav A. Bode, who will pay to the said Mrs. M. M. Clemens the entire $6000, together with an approximate of the profits earned since the date of last settlement. This is not transferable only to the heirs-at-law of the said Mrs. M. M. Clemens or their guardian, for the heirs' benefit. The above named $6000 can be used by the stated G. A. Bode either in his business or outside of it, as his judgment may elect.'       $7000

GUSTAV A. BODE, $6000

M. M. CLEMENS."

Endorsed on the back of this agreement is as follows: The first endorsement:

"Taking effect January 1, 1894, the sum total of the within agreement is increased to seven thousand dollars ($7000), the conditions remaining the same, excepting that this additional $1000 be returned to the said M. M. Clemens in January, 1895, or January, 1896, just as M. M. Clemens may dictate.

GUSTAV A. BODE."

The second endorsement:

"At request of Mrs. M. M. Clemens the above mentioned one thousand dollars ($1000) will remain a part of the within contract for two years from January 1, 1896.       M. M. CLEMENS,

GUSTAV A. BODE."

"By mutual agreement the amount is changed from $7000 to $7777, and the conditions remain the same as stated in body of agreement, excepting that time for return of the $7777 is to be agreed upon January 15, 1901.

"Dated at Galesburg, Illinois, January 14, 1899.

GUSTAV A. BODE,

M. M. CLEMENS."

"GALESBURG, *August 3, 1900.*

"Seven hundred and seventy-seven dollars of this contract has been this day refunded, leaving net investment seven thousand ($7000) dollars. This agreement expires January 15, 1903, in place of 1901.       M. M. CLEMENS,

GUSTAV A. BODE."

First of the letters in chronological order is dated February 14, 1891:

*"Matilda M. Clemens:*

"DEAR FRIEND—I am in receipt of your favor with agreements signed and also draft for $1000. I enclose one of the agreements signed by me. I would say more now, but as I am a little rushed I will let it go until next time. Now that we are partners I will just simply say that I will do my utmost to make you feel satisfied with this world.

"Yours very respectfully,

G. A. BODE."

The second letter is dated January 18, 1892:

*"Mrs. M. M. Clemens:*

"DEAR FRIEND—I received your letter with draft this forenoon. I think it best to give you a certificate showing that I have the money, and I enclose it. I made it for two (2) years. If you would rather have it for one year, send it back and I will exchange it and return it to you. I will do my best for you and remit the profit at same time that I remit the profit on the other $1000. If you would rather have it some other way, advise me and I will do as you wish me. We are glad that Ic's improvement is permanent. Please accept our heartfelt thanks for your well wishes endeavors. Trusting you are having a nice trade, I am your friend,

G. A. BODE."

The third is a certificate dated November 28, 1892:

"This is to certify that I have received from Mrs. Matilda M. Clemens, of Fairbury, Illinois, the sum of $4550, to be used by me in such manner as to realize her the largest profitable income.

GUSTAV A. BODE."

Underneath the above is written:

*"Mrs. Clemens*—The above will do until you get the other $3450 in, and then I will give you one writing to cover the entire $7000."

The fourth is a letter written by appellee, the material parts of which, omitting certain references to family matters, are as follows:

*"Mr. G. A. Bode:*        "FAIRBURY, ILL., *Jan. 16, 1893.*

"DEAR FRIEND—* * * I wrote you that I was not just satisfied with the agreement you sent. It was not what I expected, and your second letter convinces me we are laboring under a misunderstanding. I thought all the time you expected to use my money in your business and would give me such profits as it realized. Don't you remember me saying, before I sold my business, I would sell if you would let me put the money in your extract business, the same as you had the $1000, and you said you would, and as you could not make any change in the business until the first of the year you would use that money I sent you to the best advantage until that date? Then I understood you was to put it in your business and give me papers to that effect. I don't understand your writing about having it out on ninety days' time when I expected it to go into your business January 1. When you write the agreement I would much prefer you would say the money was in the business and state a per cent that it will not fall below; in fact, just duplicate the agreement for the $1000, only have it for $6000. (I will just leave the $1000 as it is, as it has one more year to run, and in case I should need the money in one year it will be due at that time.) Have the article for $6000 drawn up for a period of eight years, as Claude will be twenty-one then and he can take this care off of you. I would rather you would mention the amount you will pay me each month and state it is to be interest on the principal. I have found by keeping account of everything this month that $50 will not run us, as up to the 15th my expenses are $39.58, and I don't see no reason why it won't be just as much the rest of this month. You see I am paying $10 for rent and $10 for B. and S. for children, and that takes quite a piece from $50. I think I will have to ask you to send

me $75 per month, and please state in article when balance of interest is to be paid. I·am very sorry of the delay in answering your letter but it could not be avoided. I must stop writing, as my eyes are paining me. If I have failed to make myself understood I hope you will tell me just where. After all of our conversations on this subject I did not think we would have any trouble about the agreement. I will return the one you sent me when I hear from you again, or destroy it, as it is not signed. I don't think it will matter what I do with it, but I will keep it until I hear from you again. I am glad you are well again. When do you expect to move? We are all well but our eyes, and I hope they will be all right soon.

"Ever your friend,          M. M. CLEMENS."

In a reply dated January 18, 1893, Mr. Bode wrote as follows; a few words not being legible:

*"Mrs. M. M. Clemens:*

"DEAR FRIEND—Your letter reached me this morning and the contents of same are noted. Mrs. B. and myself are sorry to hear of your eye affliction, and I trust it will leave no bad effect on either of you. I will answer your letter by first saying that I understood that I was, and I expect, to use your money for your benefit in the extract line. The reason that I loan money for 60, 90 and 120 days at a time is, because I nearly always have from $2000 to $5000 more ready money than the immediate wants of my business justifies, and as I cannot get interest from my bank on it, I look about and find a safe place to invest it for the time desired and thereby make the profit at the end of the year to amount to just * * * left it unused at the bank. This makes that clear to you, I hope. Now, then, about the paper I sent you. In the first place, if I gave you an ordinary partnership paper, then in case of my death you would be obliged to depend upon the ability of the administrator to turn the real estate and other assets into cash, and in case of bad handling or financing (as is often the case with estates)

you might not realize all that is coming to you, and even if you did get every cent you would get it much later than if it is done as I intended for it to be done. I will try to explain my object and also my desire in sending you the paper I did. First of all comes the matter of safety,—that is, to make you perfectly safe in case of my death. To do this I put an insurance of $10,000 on my life, which is payable to my wife. Out of this she will pay you the amount due you, and as this insurance money is not a part of the estate it will not come under the jurisdiction of the court, and will thus simplify matters to such an extent that you can close it up among yourselves by you giving her my paper back and she giving you the cash. Should Mrs. Bode die first, then I would have your name put on the policy to the amount of your investment, and then you would in that event also be safe. I want to arrange everything to your entire satisfaction and at the same time make it as simple and easy as possible for you to get all of your money back at the earliest possible moment after my death, should it happen during the time I have your money, and it is the * * * at heart when I made out the paper. Regarding the per cent you will get, I can simply say that it will be just as large as what my own per cent amounts to, and while I never expect to see it as low as fifteen per cent, it might by unexpected conditions of trade come to that, but I rather look for it to go to twenty-five per cent or thirty per cent before five years, as the business is growing and the quality of the extracts are making new trade continually. But then, what is the use of talking about that here? The whole thing must be left entirely with me to make the result good and the returns to you correct. It is therefore necessary, above all other things, that you have explicit confidence in me. Without this you will never be contented. And furthermore, I must insist on returning the money to you forthwith if you feel the least concern about its safety or mistrust me incapable of doing as I said I would, or that I

will not do so even if I could. I have tried to make myself plain, and if there is anything about this letter that is not perfectly clear to you I wish you would write me about it and I will explain more fully, if possible. I shall take a tissue copy of this so that I can easily refer to it should you find it necessary to ask concerning it. I have changed the monthly remittance to $75, and as I told you when here, if you needed more just say the word and I shall send it. I shall await your reply regarding the agreement, and if you still think that you would rather have a regular partnership agreement you shall have it, although I feel I have done the very best that can be done for safety, simplicity and prompt liquidation in case of my death. You say in eight years Claude will be twenty-one years old. Don't you think that when he gets to the age of eighteen or nineteen that by your guidance he can start in to properly care for and look after money matters? I appreciate the fact that young men entrusted with $2000 or $3000 at that age are liable to under-estimate the value of money, but I feel that Claude is a boy who will grow up into manhood realizing just what money is worth. The flat is about ready for occupancy, but I shall wait a while longer, as I want to make sure that Gustav is entirely clear of the after-effects of measles, especially as the brick-work and plastering was done in cold and partly rain weather.

"Hoping to hear from you as soon as you can conclude, I am your friend,                    G. A. BODE."

Appellee answered as follows:

"*Mr. G. A. Bode:*          "FAIRBURY, ILL., *Jan. 20, 1893.*

"DEAR FRIEND—Your letter was received last evening. You are so kind to let me have the agreement written as I wish, and, my dear friend, I do trust you thoroughly, and I have perfect confidence in your ability to do as you say and know you will if you can. My sending you the money before we had the written agreement proves to you I trust

you. Forgive me for troubling you so much about this, but I realize life is short and I don't think I will live very long. In case of my death these papers will pass into the hands of the children's guardian, and on the other hand, should you be taken away you know how an estate becomes involved in law. It was so kind in. you to have your life insured, as you say, for security to me; but I understand for that to be security the amount coming to me should be named now, and I have a copy of the policy, otherwise Mrs. Bode could use her own pleasure about paying me or keeping it all. Oh! I do wish I did not have to say such things! You must understand me. I am so afraid I don't express myself right. If .I was there I could say what I want to and I know it would not sound as it does when it is written. You know I want you to live years and years after I am gone, and I think it likely you will, for you have something to live for.

"Regarding the agreement, I think you know from my last letter about what I want. I do not want to trouble you too long with this money, and, as you suggest, Claude may be able to do for us by the time he is eighteen or nineteen, which will be in five years. I will just leave the $1000 as it is and will take that off your hands in one year, and then, if you will, make $3000 payable in five (5) and the other $3000 in eight (8) years. I would prefer the agreement written as the one is for $1000, giving me an interest in your business for a certain length of time, but as you probably have my last letter before this you will know just what I want.

"With love to Mrs. B. and children and regards to yourself, I am your friend and tormentor, . M. M. CLEMENS."

The next letter is as follows:

*"Mr. G. A. Bode:*          "FAIRBURY, ILL., *Jan. 23rd, 1893.*

"DEAR FRIEND—Your letter received, also the agreement. I am pleased with the agreement and am very sorry I have troubled you so much about it. I want you to know

I feel perfectly satisfied and shall not worry at all. I know you will do just what you agreed to. There is not another man on earth that I could trust my all with and not feel afraid I might°lose it, but my inner self tells me this is all right, and I know it is. I return the agreement signed by me. I also send the one for $1100. The ones for $7000 that are not signed I will destroy. We are having pleasant weather here now. It is nice sleighing, but I think we will lose the snow before long if the weather continues so warm. I suppose Mrs. Bode is very busy getting ready to occupy her new house. Give her my love, and tell her I am always glad to receive a letter from her.

"Thanking you for your kindness, I am, as ever, your friend,
                                        M. M. CLEMENS." .

The agreement referred to in the foregoing letter appears to be the agreement dated January 2, 1893, first above set forth. A letter dated February 24, 1901, is the last of those written by the deceased, who died a few days after. It is as follows, omitting certain portions relating to family matters or not apparently relevant:

*"Mrs. M. M. Clemens, Munchen, Ger.*

"DEAR FRIEND—* * * It is just two months ago to-day that we arrived home, and they have been without question the busiest sixty days, as well as the most trying, that I ever lived through. It was not until yesterday forenoon that I was able to get 1900 figured out correctly, and you know how anxious I am to get such matters off my hands as soon after the end of the year as possible, but it seemed that one thing and then another turned up to hamper me. * * * In spite of the fact that I was away from the business this past summer a good part of the time that I could have increased the total net profits, the profit would have been twenty-one per cent but for one loss of the matter of nearly $1000. This loss is in such shape that it cannot be considered an asset, as it may never pay out more than ten

per cent, and on this account I have charged it to profit and loss. If the party should get on his feet again I may be able to realize on it, with interest, but in the present condition he is in it makes the case a very doubtful one, and as much as I do not think it advisable to call the claim an asset. The net profit of all invested is a fraction of a mill over eighteen per cent. I will carry the fraction over and call it even eighteen per cent, on which basis I remit.

"Jan. 1, 1900, to June 30, 1900, $7777 at 18%...........$ 699.93
June 30, 1900, to Aug. 1, 1900, $7700 at 18%...........  115.50
Aug. 1, 1900, to Dec. 31, 1900, $7000 at 18%..........  525.00

    Total.......... ................ ..................$1340.43
Remitted during 1900................................  900.00

                                                       440.43
For January and February, 1901.....................  150.00

                                                       590.43
Money order on B-V Bank of Munchen, enclosed herein.  590.43"

"It is my sincere wish that you will be satisfied with the result, and I feel contented because I know that I did better than several of the rest that are at it."

The defendant introduced also a letter from appellee to appellant's attorney, which is as follows:

"GALESBURG, ILL., *Oct. 16, 1902.*
*"Attorney Francis E. Croarkin, Chicago, Ill.*

"DEAR SIR—I just received in this morning's mail a letter from my attorney, Mr. Wm. D. Godfrey, stating you wanted an itemized statement of all payments received by me from Mr. Bode, as interest or otherwise, during his lifetime. I immediatetly went to Mr. Godfrey's office, but he is out of town and will not return until next Monday. His secretary showed me your letter of October 10, making the request for statement. I am sorry he did not notify me sooner, for then I could have consulted him and no doubt he could have explained to you in less words what I think you should know to thoroughly understand both the business and friendly relations concerning my contract with Mr.

Bode. You state there are some things you do not understand. I will try to explain.

"Mr. Bode and my late husband were sincere friends, and a short time before my husband's last illness, in 1890, he and Mr. Bode made a trip together looking for a location to enter into a business partnership. After my husband's death Mr. and Mrs. Bode came to my home in Fairbury, Ill., and Mr. Bode told me my husband had asked him to look after us in case he (my husband) should die. He said he had a presentiment he would not live long. His presentiment proved true, as he died in about four weeks after taking this trip. Mr. Bode kindly offered to help me and I was benefited by his advice. At the time of his death my husband had a business that was bringing us from $300 to $800 per month. We decided to get a man to continue the business for one-half of the profit. This was not successful, as the business was decreasing and did not much more than pay expenses. Through Mr. Bode's advice I decided to take hold of it, and I ran the business for fourteen months and I was very successful. I brought each month's sales up to what my husband's were during the last year of his life. This was very encouraging financially, but it was very trying on my health, and I had two small children that needed my attention. Now that the business was in good standing again, Mr. Bode advised me to sell, stating that he was willing to take the money and give me all he could make out of it in remembrance to what he had promised my husband. He also stated he would be willing to guarantee it would never run below fifteen per cent. Hence the contract, a copy of same I enclose to you. I sold my business, together with my house, for $7000. This amount I eventually trusted to Mr. Bode with full consent of Mrs. Bode. Thus you will see that our business relations were on a friendly basis and I trust also on a legal basis. Mr. Bode kept his part of the contract faithfully up to his death. A part of the time the interest slightly exceeded fifteen per cent, and on the 25th

of each month $75 was mailed to me for our living expenses, and in January of each year I received a statement of what had been made on my money and a check for whatever it exceeded $900. The January check usually included the $75 for the said month of January. I cannot send you an itemized statement. Owing to the friendly relations of the families I did not think it necessary to keep account of such, and as Mr. Bode was much younger than I, his death before my own was unexpected. However, I enclose to you a copy of the letter written to me by Mr. Bode the day before his death. In same he had written a statement of the preceding year, and his check book will show what has been mailed to me. When I first loaned money to Mr. Bode I got a statement on his financial standing, and in 1891 or 1892 his standing was $2000, so you see while he was making fifteen per cent for me on my money he was also making money for himself. Just at the time he received my money he built the brick building now occupied by the family and the office. In said office you will find a picture of my husband in a frame hanging on the wall, unless it has been removed since last May, when I was there. This will help you to understand the friendship existing between Mr. Bode and my husband.

"Trusting you will pardon the length of this explanation, and feeling confident you will look at the enclosed copy of contract in both the friendly and legal relations, I am sincerely yours,            (MRS.) M. M. CLEMENS,
*828 North Cherry Street, Galesburg, Ill.*

"P. S.—I am willing to answer any questions you may wish to ask. Any communication from you will receive a prompt reply.            M. M. C."

In addition to the foregoing written evidence, the bookkeeper employed by Bode during all of the time covered by his transactions with appellee testified that Mr. Bode kept two bank accounts,—one a private account and the other his business account. The book-keeper had no knowledge of

the business relations between Mr. Bode and appellee until after Bode's death. The book-keeper testified that Bode built a house costing $11,000 or $12,000, which was completed in 1893. She also testified that she did not make up any trial balance annually, monthly or at any time showing percentage of profit or loss in the business; that she was never called upon to make any estimate of profits due appellee and knew of none being made by Mr. Bode. The evidence is sufficient to raise a reasonable probability that a considerable amount of appellee's money was used by Bode in the construction of the building.

The foregoing statement embraces, in substance, all the facts proven on the trial.

FRANCIS E. CROARKIN, for appellant.

KRETZINGER, GALLAGHER, ROONEY & ROGERS, for appellee.

Mr. JUSTICE VICKERS delivered the opinion of the court:

The sole question in this case is whether the contract between appellee and appellant's intestate is usurious.

Usury is defined to be an illegal profit required and received by a lender of a sum of money from the borrower. (Blackstone, 156; Bouvier's Law Dict.) To constitute usury, in contemplation of law, the following essential elements must be present: (1) There must be a loan or forbearance; (2) the loan must be of money or something circulating as money; (3) it must be re-payable absolutely and at all events; (4) something must be exacted for the use of the money in excess of and in addition to the interest allowed by law. Some decisions appear to imply that a fifth element should be added, consisting of the intent of the parties or at least of the lender, but it seems to us quite as accurate to say that the intention of the parties as the same appears from the facts and circumstances of the case

may be considered, in connection with the other evidence, in determining whether the essential elements of usury are present in the particular case under investigation. The form of the contract is not conclusive of the question. The desire of lenders to exact more than the law permits and the willingness of borrowers to concede whatever may be demanded to obtain temporary relief from financial embarrassment have resulted in a variety of shifts and cunning devices designed to evade the law. The character of a transaction is not to be judged by the mere verbal raiment in which the parties have clothed it, but by its true character as disclosed by the whole evidence. If, when so judged, it appears to be a loan or forbearance of money for a greater rate of interest than that allowed by law, the statute is violated and its penalties incurred, no matter what device the parties may have employed to conceal the real character of their dealings. In *Cooper* v. *Nock*, 27 Ill. 301, on page 302, this court said: "In such transaction it is the intention of the parties, not the forms employed, which fixes its character. If it were otherwise, every species of fraud, oppression and wrong might be perpetrated with perfect impunity. Hence in trials of questions of usury it has ever been held that no device intended to cover up the real character of the transaction can ever avail to defeat the statute." It is the constant practice of courts to resort to extrinsic evidence to determine the question of usury. (2 Jones on Evidence, sec. 441; 1 Elliott on Evidence, sec. 591; *Ferguson* v. *Sutphen*, 3 Gilm. 547; *Reeve* v. *Strawn*, 14 Ill. 94.) Resort to parol evidence in such cases does not in any way depend upon the existence of an ambiguity in the written contract, but it is justified on the ground that the charge of usury raises a question of the legality of the instrument to the extent that usury, under the statute, renders contracts illegal or void. An agreement to pay an illegal rate of interest is void because it is in violation of a public law, and such illegal nature of the agreement may be shown by any compe-

tent evidence. Under the law applicable to the case in hand all of the correspondence and dealings between the parties to the transaction under consideration are proper evidence to be considered in the decision of the issue involved. The facts are open for consideration by this court. The statute making the finding of the Appellate Court conclusive upon this court has no application to this case. In the adjustment of claims of the character of the one here involved the probate court exercises an equitable jurisdiction and may resort to equitable procedure, and upon an appeal to this court it is our duty to examine and determine questions of fact as well as those of law. In such case the rules applicable to appeals in chancery apply and the facts are reviewable. *Cheney* v. *Roodhouse,* 135 Ill. 257; *Henry* v. *Caruthers,* 196 id. 136.

Having made these general observations regarding the law, we will proceed to examine the evidence and express our views as to the proper conclusion to be drawn therefrom.

Two opposing theories are pressed upon our attention by the parties to this controversy. As already indicated, appellant's contention is that the contract of January 2, 1893, shows upon its face that it was a loan of money at a usurious rate of interest, and that there is nothing in the other evidence which relieves it of its usurious character. On the other hand, appellee contends that she turned this money over to appellant's intestate to be by him invested in his extract business for a share in the profits thereof, with a guaranty that such profits would not fall below fifteen per cent per annum, and that thereby she became a partner in the profits of said business.

While the contract was executed between the parties January 2, 1893, it is clearly established that the business relations between the appellee and appellant's intestate commenced early in 1891. The first letter introduced in evidence written by Bode to appellee is dated February 14, 1891, in which he says: "I am in receipt of your favor

with agreements signed, and also draft for $1000. I enclose one of the agreements signed by me. I would say more now, but as I am a little rushed I will let it go until next time. *Now that we are partners* I will just simply say that I will do my utmost to make you feel satisfied with this world." The agreement referred to in this letter is not in the record. The $1000 the receipt of which is acknowledged in this letter was the first money paid by appellee to Bode. All that the record discloses about the form of the agreement under which this $1000 was paid is that it was an instrument signed in duplicate, and that it was satisfactory to appellee and that appellant's intestate construed it as constituting the parties partners. It was undoubtedly so understood by appellee. Afterwards, during the year 1892, appellee paid Bode other sums of money, and he gave her acknowledgments of its receipt which appellee thought varied from the original understanding. Under date of January 18, 1892, appellant's intestate wrote appellee, saying: "I received your letter with draft this afternoon. I think it best to give you a certificate showing that I have the money, and I enclose it. * * * I will do my best for you and remit the profit at the same time that I remit the profit on the other $1000." Ten months later, November 28, 1892, we find the following writing signed by appellant's intestate and transmitted to appellee: "This is to certify that I have received from Mrs. Matilda M. Clemens, of Fairbury, Ill., the sum of $4550, to be used by me in such manner as to realize her the largest profitable income." Below the signature of Gustav A. Bode, the following words are written: "Mrs. Clemens—The above will do until you get the other $3450 in, and then I will give you one writing to cover the entire $7000." So far as the record shows appellee accepted this certificate and acquiesced in the suggestion that it would answer the purpose until the remainder of the money was paid over, which the evidence shows occurred before January 2, 1893.

After appellant's intestate secured the full $7000 of appellee and sent her the "one writing to cover the entire $7000," appellee, believing that she saw in the writing a departure from the original understanding, protested against the form of the agreement in her letter of January 16, 1893, in which she says: "I wrote you that I was not just satisfied with the agreement you sent. It was not what I expected, and your second letter convinces me we are laboring under a misunderstanding. I thought all the time you expected to use my money in your business and would give me such profits as it realized. Don't you remember me saying, before I sold my business, I would sell if you would let me put the money in your extract business, the same as you had the $1000, and you said you would, and as you could not make any change in the business until the first of the year you would use that money I sent you to the best advantage until that date? Then I understood you was to put it in your business and give me papers to that effect. I don't understand your writing about having it out on ninety days' time when I expected it to go into your business January 1. When you write the agreement I would much prefer you would say the money was in the business and state a per cent that it will not fall below; in fact, just duplicate the agreement for the $1000, only have it for $6000."

We have in the foregoing quotation from appellee's letter clear evidence of what she intended to do and what she really believed she had done, as subsequent events will show. She intended that this additional amount of money should go into the extract business and nowhere else. The agreement which she desired duplicated for the $6000 is the agreement referred to in Bode's letter of February 14, 1891, in reference to which he said: "Now that we are partners I will just simply say that I will do my utmost to make you feel satisfied with this world." Appellant's intestate did not give appellee a duplicate of the agreement of February 14, 1891, but instead thereof gave her the agreement of Janu-

ary 2, 1893, in reference to which appellee made her protest of January 16, 1893, and which she did not sign until after she received the persuasive letter written by appellant's intestate January 18, 1893. Before referring to the letter of January 18, we will digress for a moment to point out the relative situation of the parties as the same appears from the evidence.

The appellee undoubtedly had implicit confidence in appellant's intestate. There had been a sincere and devoted friendship existing between appellee's husband and Bode. On the occasion of his first visit to appellee's house after her husband's death, Bode told appellee that her husband, having a presentiment that he was not going to live long, exacted a promise from Bode that he would look after and care for his family. The appellee believed implicitly in the business ability and integrity of Bode, and further believed that Bode's interest in her affairs was largely due to his devoted friendship for her dead husband and the moral obligation which his promise to him imposed. Bode was an intelligent, experienced business man, whose judgment appellee no doubt believed superior to her own. Under these circumstances we can see how easy it was for appellant's intestate to vary the form of the contract and at the same time make appellee believe that its substance was retained, and that the form was only departed from in order to better protect and serve appellee's interests.

We will now return to the letter of January 18, 1893, and see how appellant's intestate answered appellee's objection to the contract of January 2, 1893, and the reasons which he gave for not duplicating the partnership agreement of February 14, 1891, as appellee had requested him to do. In this letter he says: "I will answer your letter by first saying that I understood that I was, and I expect, to use your money for your benefit in the extract line. The reason that I loan money for 60, 90 and 120 days at a time is, because I nearly always have from $2000 to $5000 more

ready money than the immediate wants of my business justifies, and as I cannot get interest from my bank on it, I look about and find a safe place to invest it for the time desired and thereby make the profit at the end of the year to amount to just  *  *  *  left it unused at the bank.  This makes that clear to you, I hope.  Now, then, about the paper I sent you.  In the first place, if I gave you an ordinary partnership paper, then in case of my death you would be obliged to depend upon the ability of the administrator to turn the real estate and other assets into cash, and in case of bad handling or financing (as is often the case with estates) you might not realize all that is coming to you, and even if you did get every cent, you would get it much later than if it is done as I intended for it to be done.  I will try to explain my object and also my desire in sending you the paper I did.  First of all comes the matter of safety,—that is, to make you perfectly safe in case of my death.  To do this I put an insurance of $10,000 on my life, which is payable to my wife.  Out of this she will pay you the amount due you, and as this insurance money is not a part of the estate it will not come under the jurisdiction of the court, and will thus simplify matters to such an extent that you can close it up among yourselves by you giving her my paper back and she giving you the cash.  Should Mrs. Bode die first, then I would have your name put on the policy to the amount of your investment, and then you would in that event also be safe.  I want to arrange everything to your entire satisfaction and at the same time make it as simple and easy as possible for you to get all of your money back at the earliest possible moment after my death, should it happen during the time I have your money, and it is the  *  *  *  at heart when I made out the paper.  Regarding the per cent you will get, I can simply say that it will be just as large as what my own per cent amounts to, and while I never expect to see it as low as fifteen per cent, it might by unexpected conditions of trade come to that,

but I rather look for it to go to twenty-five per cent or thirty per cent before five years, as the business is growing and the quality of the extracts are making new trade continually. But then, what is the use of talking about that here? The whole thing must be left entirely with me to make the result good and the returns to you correct. It is therefore necessary, above all other things, that you have explicit confidence in me."

There is nothing in this letter to indicate to appellee any change in the substance of the contract which appellant's intestate said constituted them partners. The essence of this letter is to re-affirm to appellee that she was still to be regarded as in the business on a profit-sharing basis, which she is assured will never be below fifteen per cent and may reach twenty-five or thirty per cent in five years, and that the only reason for not giving her "an ordinary partnership paper" was to avoid delay and possible loss from the legal course of settlements in case Bode predeceased appellee. With the hope of further protecting appellee she is assured in this letter that appellant's intestate had put an insurance of $10,000 on his life and made the same payable to his wife, who would be instructed to pay the appellee $7000, with an approximation of the profits earned since the last settlement. Finally, after making this explanation as to why the former partnership agreement had not been sent her, the letter concludes the explanation with these words: "I shall await your reply regarding the agreement, and if you still think that you would rather have a regular partnership agreement you shall have it, although I feel I have done the very best that can be done for safety, simplicity and prompt liquidation in case of my death." In her reply to this letter the appellee accepts the contract as explained in the foregoing letter, and says: "You are so kind to let me have the agreement written as I wish, and, my dear friend, I do trust you thoroughly, and I have perfect confidence in your ability to do as you say and know you

will if you can.   My sending you the money before we had the written agreement proves to you I trust you."   Three days later, on January 23, she again writes Bode and assures him that she is pleased with the agreement.   She says: "I want you to know that I feel perfectly satisfied and shall not worry at all.   There is not another man on earth that I could trust my all with and not feel afraid I might lose it, but my inner self tells me this is all right, and I know it is."

A letter from appellant's intestate to the appellee, dated three days before his death, closes the communications passing between these parties.   In this letter appellant's intestate sent appellee $590.43, being the balance of her profits, figured at eighteen per cent for the year 1900.   This is simply a business letter giving an account of the business for the year, in the course of which it is said:   "In spite of the fact that I was away from the business this past summer a good part of the time that I could have increased the total net profits, the profit would have been twenty-one per cent but for one loss of the matter of nearly $1000."   He closes by saying:   "The net profit of all invested is a fraction of a mill over eighteen per cent.   I will carry the fraction over and call it even eighteen per cent, on which basis I remit."

Under this evidence the conclusion is irresistible that appellee in good faith entrusted her money to appellant's intestate to be by him invested in his business, and that she was to receive a share in the profits of the business, which were guaranteed not to fall below fifteen per cent per annum. If this was the contract, or if appellant's intestate intentionally led appellee to believe, and she did in good faith believe, that appellant's intestate was using her money in his business and accounting to her from time to time for profits, the transaction could not be converted into a usurious loan by any secret intention that may have been in the mind of Bode, or by the fact that he may have used the money for some private purpose outside of his extract business.

The case of *Robbins* v. *Laswell,* 27 Ill. 365, is very similar in its facts to the case at bar. In that case Robbins furnished Laswell money to buy young cattle. Laswell was to feed, salt, handle and manage the stock until they were ready for market, and when sold the profits were to be equally divided between the parties. Laswell guaranteed that the portion of profits coming to Robbins should not be less than twenty per cent per annum on the amount of money furnished. This agreement was held by this court to constitute the parties partners in the profits, and that it was not necessary that the agreement should make both parties liable for losses. We think the principle decided in that case is applicable here. Briefly stated, appellee furnished $7000 to be invested in a particular enterprise. She was to receive a share of the profits. She assumed no liability for losses. This is not necessary to constitute the parties partners as to profits. Bode guaranteed to appellee that the profits would not fall below fifteen per cent. A share of profits may be taken as compensation for services or for the use of money. (*Lintner* v. *Millikin,* 47 Ill. 178; *Adams* v. *Funk,* 53 id. 219; *Burton* v. *Goodspeed,* 69 id. 237; *Smith* v. *Knight,* 71 id. 148; Parsons on Partnership, 72; Story on Partnership, sec. 49.) In *Goodrich* v. *Rogers,* 101 Ill. 523, in disposing of a question somewhat similar to the one involved in the case at bar, this court said (p. 529) : "We do not understand that our statute was ever intended to prevent one person from furnishing capital to another with which the two might embark in trade, although the person advancing the capital might receive profits greatly in excess of the rate of interest allowed by law."

It would require a strained and unnatural construction of the evidence to convert this transaction into a loan of money. There is no presumption of law that a contract is illegal or criminal. The illegality, if alleged, must be established by the party charging it. Where a transaction is susceptible of an innocent construction and can only be held

usurious by wresting it from its relation to other facts or by imputing to the facts a sense and meaning which they cannot reasonably bear, it is the plain duty of the court not to decree a forfeiture but to uphold the contract and enforce its obligation. (*Meaker* v. *Fiero,* 145 N. Y. 165; 39 N. E. Rep. 714.) In *Orvis* v. *Curtis,* 157 N. Y. 657, (52 N. E. Rep. 690,) it is held that an agreement between two parties to enter into a joint venture, whereby one party is to furnish the capital to carry on the business, is to share equally in the profits and in case of loss is guaranteed the return of his investment together with a large sum in excess of legal interest thereon, is not usurious, where it is not shown to be a mere device to conceal a loan of money. Such a contract constitutes a partnership. (*Clift* v. *Barrow,* 108 N. Y. 187; 15 N. E. Rep. 327; *Hackett* v. *Stanley,* 115 id. 629; 22 id. 745.) The contract involved in this case does not show on its face that it is a mere shift to cover up a usurious loan. The contract is signed by both parties, and the evidence shows that they both had the belief that to accomplish the object in view both parties should sign the agreement. Notes for money borrowed are not usually signed by the lender. Furthermore, if this was a shift or device to cover up a usurious loan it was a loan at fifteen per cent, but the evidence shows that at no time were the settlements between the parties made on the basis of fifteen per cent but always on the basis of a higher rate. If Bode borrowed this money at fifteen per cent, why should he pay eighteen per cent in the year 1900?

Our conclusion is that the evidence in this case shows that the true relation between Bode and appellee was that appellee was a partner in the profits of the extract business, and that the defense of usury is not available to appellant.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

SCOTT, FARMER and DUNN, JJ., dissenting.