Henry D. Laughlin, Appellee, v. John Irwin and First Union Trust & Savings Bank, Executors under the Last Will and Testament of Alexander Irwin, Deceased, Appellants.

Gen. No. 34,631.

Opinion filed May 19, 1931.

SIMS, GODMAN, STRANSKY & BREWER, for appellants; ELWOOD G. GODMAN and OTTO W. BERG, of counsel.

WINSTON, STRAWN & SHAW, for appellee; EDWARD. W. EVERETT and GEORGE T. EVANS, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

On December 22, 1926, Laughlin filed a bill in the circuit court against Alexander Irwin, seeking to have confirmed in him (Laughlin) the title to 800 shares of stock of the Northern Hotel Co., an Illinois corporation, and praying for an accounting, etc. Irwin filed an answer. On February 7, 1927, Laughlin filed a supplemental bill, containing additional allegations and making the Northern Hotel Co., Charles R. Holden and two other individuals additional parties defendant. After all defendants had filed answers the cause was referred to a master, before whom much oral and documentary evidence was introduced. During the hearing before the master Irwin filed an amended answer to both bills. After the taking of testimony had been completed, Irwin's death was on March 5, 1929, suggested, and the above named executors were substituted as defendants in his stead. The bill is based upon the provisions of eight written contracts signed by Laughlin and Irwin. The first is dated January 14, 1909, the last on November 22, 1923, and the others on various intervening dates. For many years Laughlin and Irwin had been friends, both had been large stockholders in the Northern Hotel Co., both had been officers and directors thereof, and both had been closely associated in the management of the Great Northern

Hotel, at Jackson and Dearborn Streets, Chicago, which was the hotel property operated by the corporation. From the eight contracts it appears that Irwin from time to time had loaned to Laughlin the aggregate sum of $80,000, that Laughlin had transferred to Irwin as security a total of 800 shares of the stock of the Northern Hotel Co. of the par value of $100 a share, and that Irwin was to receive the dividends on the stock *in lieu of interest.* The total amount of dividends which he received on the stock between 1909 and 1926 was $87,850. One of the issues was whether or not these contracts were pledge contracts. Both the master and the court found that they were such and not contracts of sale, and this finding is not here contested by Irwin's executors. Another issue was whether the contracts were "usurious." The master found that they were, but the court upon exceptions adjudged that they were not. Still another issue was whether Irwin was entitled, as claimed, to the sum of $30,000, by reason of a certain promise made by Laughlin whereby he and Irwin were to divide equally certain profits from the sale of the 800 shares of stock, above the par value. Both the master and the court found against Irwin's executors on that issue. In the decree, entered April 28, 1930, the court adjudged in part substantially as follows:

That the 800 shares of stock are the property of Laughlin and he is entitled to possession of the certificates therefor, free and clear of all claims on the part of Irwin's legal representatives; that Laughlin is entitled to receive *since August 12, 1926* all dividends on said shares and to be paid all moneys distributed upon the same since said date and to receive all benefits flowing to him as owner.

That Laughlin is not entitled to be reimbursed or to be paid back any part of the $87,850, received in dividends by Irwin in lieu of interest on said loans, aggre-

gating $80,000, "on the ground that such payments constituted payments of usury," notwithstanding that the proof shows that Laughlin has offered to allow defendants to retain, out of the moneys in their hands belonging to him, a sum equal to 7 per cent on said respective loans, from the time the same were made down to the date of the payment to Irwin of the amount of the aggregate principal of said loans; and that Laughlin is not entitled to receive from defendants any amount claimed by him to have been paid to Irwin as usury on the loans covered by said pledge contracts, and is not entitled to recover the difference between said $87,850 and the amount of legal interest on said loans computed on the basis of 7 per cent.

That on August 10, 1926, when Charles R. Holden, agent for the stockholders of the Northern Hotel Co., paid to Irwin a total of $140,000, representing the partial distribution of the portion of the purchase price of said Northern Hotel Co., to which said 800 shares were then entitled, the said principal sum of $80,000 representing the aggregate amount of the loans for which said stock was pledged, "was voluntarily paid"; that the interest on said sum of $80,000 "was voluntarily paid" by the dividends received by Irwin in his lifetime from the Northern Hotel Co., *in lieu of interest,* in the aggregate sum of $87,850, and that said loans, both as to principal and interest thereon, by such payment "have been fully discharged and complainant ever since said date became and now is entitled to have returned to him the certificates of said pledged stock or to receive such other certificates as have been or may be issued in lieu thereof."

That Irwin's said executors pay to Laughlin the sum of $40,473.80, and the additional sum of $6,773.73 (being interest on said first mentioned sum at the rate of 5 per cent per annum from the date of the filing of the bill to the date of entry of this decree), "making

the aggregate amount due complainant from said defendants $47,247.53.''

That Irwin ''has *not* satisfactorily established any binding, legal obligation, verbal or otherwise, and no such obligation exists under which or by reason of which the complainant, Laughlin, is or should be required or obligated to divide with the defendant, Irwin, or his legal representatives, the gains, profits, or earnings on said 800 shares of stock of said Northern Hotel Co. *over par,* resulting from the sale of the properties of said Northern Hotel Co. on April 26, 1926.''

And the court further adjudged and decreed that Laughlin have judgment against Irwin's said executors for said two sums, $40,473.80 and $6,773.73, and that one-half of the taxable costs be assessed against Irwin's executors and one-half against Laughlin.

From the decree both Irwin's executors and Laughlin prayed separate appeals, which were perfected in the circuit court. The transcript of the record was filed in this court by Irwin's executors and on the record Laughlin has assigned cross errors to the effect that the circuit court erred in denying to him the recovery back of the claimed usurious payments made under the eight contracts. His counsel here ask that the decree ''be affirmed to the extent that it awards complainant a recovery in the amount of $47,247.53, and that it be reversed to the extent that complainant is denied any share in the amount of $87,850, received as dividends, but in fact as interest and in violation of the law of Illinois denouncing usurious payments, and remanded with directions to the circuit court to proceed with an accounting in regard thereto.'' And they state in their brief that the dividends of $87,850, received by Irwin, are ''in excess of the highest legal rate of interest on the loans made to complainant'' by the sum of $30,800. The main contention of counsel for Irwin's executors is that the court erred in holding that Laugh-

lin was not legally obligated to divide equally with Irwin the gains or profits *over par* on the 800 shares of stock, arising from the sale of the hotel property. And counsel argue that Laughlin's promise, that such division would be made, is supported by good and sufficient considerations, and, further, that Laughlin is estopped by his conduct to contend to the contrary. The evidence discloses that one-half of these gains or profits *over par* amounts to $30,000.

The evidence further discloses the following: Laughlin was an experienced lawyer. He had practiced his profession in St. Louis, Missouri, for about 25 years, and had there served as a judge of the circuit court for several years. Subsequently he moved to Chicago, ceased to practice his profession and engaged in various business enterprises. The eight contracts herein involved were all prepared and dictated by him. When the first contract, dated January 14, 1909, was presented to Irwin for signature, and he suggested that his lawyer should first pass upon the provisions of the contract for him, Laughlin replied that he was a lawyer and would not draft a contract that was not all right and that the proposed contract was a fair one for both parties, etc. At this time Laughlin was a director and president of the hotel company and the dominating head in the management of its affairs. Irwin also was a director, and in May, 1915, on Laughlin's motion, became vice president. Both were large stockholders, and then and thereafter they and one Magner held the stock control of the company. Laughlin held the position of president and was said dominating head from 1909 until April, 1926, when the hotel property was sold. During this period, however, Laughlin did not himself own a majority of the stock, and on numerous occasions Irwin rendered financial aid to Laughlin by loans of money, etc. In 1917, it became necessary for Laughlin to procure an

appeal bond for $60,000 in a case in which he was the unsuccessful litigant, and, at his request, Irwin and his brother (James C.) signed the bond as sureties and filed a property schedule. Irwin testified that, at the time Laughlin made said request and was asked what he (Irwin) would get for signing the bond, Laughlin replied: "You have some stock of mine that is standing in your name; I will agree to give you *half of what this stock will sell for over par for your part in this bond"*; that the par was $100 a share; and that the arrangement was that whatever that stock sold for over that par "we would split fifty-fifty," when the hotel property was sold. In 1918, after said appeal case had been decided against Laughlin and it became necessary for him to pay about $109,000 and to borrow the money for such payment, Irwin and his brother guaranteed Laughlin's note for that amount which was delivered to the Union Trust Company bank, Chicago. In May, 1921, Laughlin, needing money, borrowed from Irwin the sum of $5,195.69, and gave his demand note therefor, payable to Irwin. In January, 1925, Laughlin needed $13,000 to buy 130 shares of the stock of the company from John Irwin, a nephew of Irwin, and, at Laughlin's request, Irwin again came to his financial aid and loaned him said sum upon his demand note, payable to Irwin and dated January 5, 1925. Irwin further testified that subsequent to the appeal bond transaction Laughlin, on numerous occasions when he needed financial assistance, repeated his promise that Irwin was to receive one-half of the gains and profits on the stock over par if and when the hotel property was sold, and that these repetitions of the promise were so frequent that "it was regular stuff." Although Laughlin testified that he "never undertook to withdraw that promise," his position on the trial was, and is here, that it was made in consideration only of love and affection for Irwin and his brother

(James C.) and that it was not supported by any legal or valid consideration. Prior to the sale of the hotel property and while negotiations to that end were pending, Irwin requested Laughlin to put his promise in writing and Laughlin agreed to do so. On September 1, 1925, they signed an agreement (drafted by Laughlin) pertaining to the 800 shares of stock and a pending deal for the sale of the hotel property, etc. The 1st and 8th paragraphs of the agreement are in part as follows:

"1st. Laughlin having already succeeded in inducing others to deposit their shares subject to the deal in question, Irwin will forthwith deposit with the Union Trust Company all the shares of stock in the Northern Hotel Co. which he holds,—the 400 shares belonging to himself and the 800 shares in his name belonging to Laughlin, and will leave all so deposited with the Trust Co., and all assigned in blank for delivery to the purchaser in the event they are paid for within 90 days, and will accept in payment for all $250 a share. . . . Having received the proceeds of all he will retain the moneys payable to him for his 400 shares, and will also receive the moneys payable to him for the 800 shares belonging to Laughlin, out of which he will reimburse himself his loans to Laughlin on account of said 800 shares, amounting in the aggregate to $80,000. But, *inasmuch as Laughlin gave to Irwin his verbal promise to divide with him the gains on said 800 shares,* Irwin *will retain one-half of the difference* between the amount he advanced on account of them and the amount he collects on account of them, *and will account to Laughlin for the other half;* by which is meant that he will retain $60,000 of the gains on said 800 shares and will account and turn over to Laughlin the other half of said gains, amounting to $60,000.

"8th. This contract is made in anticipation of the success of the pending deal, . . . but if that deal for any cause fails of success, . . . this agreement shall also be treated as having failed of its purpose, and of no force or effect; and the parties shall be restored to the *status quo* as that stood prior to the making of the agreement; and all the stock deposited by Irwin with the Trust Co. shall be returned to him, and *he shall continue to hold it* in the same manner, *and with the same rights and obligations,* as he held it prior to the entering into it by the parties hereto."

The evidence further discloses that said pending deal failed of consummation but that Irwin did not cause the 1,200 shares, so deposited by him with the Trust Co. to be returned to him; that a sale of the hotel property and of the stock held or controlled by them had long been in contemplation by them; that as early as 1921 Laughlin told Irwin that, as he (Laughlin) was getting old and his health was poor, he thought it wise to sell out; and that he then "solicited his cooperation" in a sale and "said to him that I would make no contract that he (Irwin) did not first approve." After the failure of consummation of said deal, Laughlin, assisted by Irwin, made other efforts to bring about a sale, and finally one William M. Collins offered $1,600,000 for the hotel leasehold, building, furniture, fixtures, etc. Laughlin testified that when this offer was made he and Irwin "immediately agreed that the thing to do was to let him (Collins) have it." Finally a contract for the sale was executed in April, 1926, and the sale to Collins consummated in July, 1926,—he paying the sum of $1,600,000 to Charles R. Holden (a vice president and general counsel of said Union Trust Company), who had been appointed the agent of the stockholders of the hotel company to make distribution to them of the proceeds of the sale. On August 10, 1926, Holden made a partial distribution

of $175 per share to the stockholders of record. Included in the distribution was a payment to Irwin, at said rate, of $70,000 for the 400 shares which he owned in his own right, and a payment to him of $140,000, for said 800 shares of stock. Holden gave Irwin a check for $210,000. Laughlin was present at the time and made no objection. Holden then had in his possession the two Laughlin notes, payable to Irwin's order, for $13,000 and $5,195.69, which still remained unpaid, and Holden indorsed on each "Paid by debit vs. $210,000," and handed them to Laughlin. On the following day (August 11) Holden forwarded to Laughlin a statement of account, in which mention was made of said two notes, which with the accrued interest aggregated $19,526.20. Laughlin testified in substance that he previously had told Holden that Irwin, out of said $140,000, was to retain the $80,000 (which Irwin had loaned to him under the eight contracts) and also, out of the remaining $60,000, was to retain the said amount ($19,526.20) of said two notes; that thereby said loans, aggregating $80,000, and said two notes were paid; and that as to the net balance remaining he and Irwin "would adjust our own accounts." On August 11, also, Irwin personally delivered to Laughlin a letter, containing a written statement of account and Irwin's check, payable to Laughlin, for $10,473.80. The statement was to the effect that after deducting the $80,000 from the $140,000, a balance of $60,000 remained; that after deducting therefrom $30,000, for Irwin's one-half share under said profit sharing promise or agreement, there remained $30,000; and that after deducting the sum of $19,526.20 for the payment of said two notes there remained a net balance due to Laughlin of $10,473.80, for which a check was inclosed. Irwin testified that when he delivered the envelope to Laughlin it was *unsealed* and that he "told Laughlin what was in it," who replied: "I won't

see it now; I will look it over after I come back from my trip out west." Laughlin testified that when Irwin delivered the *sealed* envelope he said there was a check in it, but that he (Laughlin) did not then open the envelope; that on the following day he left for Boise, Idaho, and did not return to Chicago until about the middle of September; that he "never did open the envelope with the check inclosed"; that about a week after his return from Idaho he "delivered the envelope, *sealed* as it was when delivered to me, to Mr. Miller" (his then attorney); that Miller "did not open it in my presence"; but that he "probably told Miller at the time what had occurred between Irwin and me." About two months later Irwin received a letter, dated December 14, 1926, from a firm of Chicago attorneys, returning said check for $10,473.80, and stating that the same "is respectfully declined." On December 22, 1926, the present bill was filed.

After reviewing the evidence, as contained in the abstract of this voluminous record, and after considering the briefs and arguments of opposing counsel, we are of the opinion that the court, as to the accounting portion of the case, erred in not allowing to Irwin's executors an additional credit of $30,000, for Irwin's one-half share of the profits *over par* on said 800 shares, as promised by Laughlin. The court denied such credit solely because, as stated in the decree, Irwin "has not satisfactorily established any *binding, legal* obligation, verbal or otherwise," whereby Laughlin should be required to make such a division. Counsel for Laughlin contend that Laughlin's promise to divide such profit was "without consideration and evidenced a mere intention, at the time when the promise was made, to make a gift or donation at some possible and undetermined future time." Counsel, however, do not deny that Laughlin made the promise and many times repeated it, especially when he solicited

and obtained additional financial aid from Irwin. And we think that the contrary contention of counsel for Irwin's executors (viz., that Laughlin's promise is supported by good and sufficient considerations) is amply sustained by the evidence and the law. In *Schlatter v. Triebel,* 284 Ill. 412, 415, it is said: "A contract to be legally binding must be based on a consideration, but any act which is a benefit to one party and a disadvantage to the other constitutes a sufficient consideration to support a contract." (See, also, *Burch v. Hubbard,* 48 Ill. 164, 171; *Buchanan v. International Bank,* 78 Ill. 500, 505.) Applying this principle to the present case we think that Irwin's signing of Laughlin's appeal bond for $60,000 in 1917; his written guaranty of Laughlin's note for $109,000 in 1918; his loaning in 1921 and in 1925 to Laughlin upon the latter's demand notes the respective sums of $5,195.69 and $13,000, which notes were not paid until the sale of the hotel property in 1926; his deposit at Laughlin's request of the 1,200 shares of stock with Holden; his aid to Laughlin during several years in enabling him to continue as president of the hotel company and as its managing head; his signing at Laughlin's request the agreement of September 1, 1925; and his assistance to Laughlin in consummating the sale of the hotel property, etc.;—all disclose sufficient and valuable considerations to support Laughlin's promise.

And we think that, under all the facts and circumstances in evidence and the law applicable, there is substantial merit in the further contention of counsel for Irwin's executors, namely, that Laughlin should be estopped by his conduct to contend that his said promise (which as he testified he "never undertook to withdraw") is illegal and void for want of consideration. In *Hefner v. Vandolah,* 57 Ill. 520, 523, it is said: "There can be no doubt, that if a party makes a declaration, or does any act to induce another to do an act he would not otherwise do, or to invest his capital on

the faith of such declaration or act, he will be estopped
to deny the truth of his declaration, or the just effect
of his act.'' The evidence discloses that Laughlin
first made his promise in 1917, when Irwin signed as
a surety Laughlin's appeal bond for $60,000; that he
many times thereafter, and particularly when solicit-
ing further loans or advances from Irwin, repeated the
promise; that he ''solicited Irwin's co-operation'' in
the sale of the hotel property and the latter always
thereafter assisted him to that end; that in 1925, after
negotiations had progressed so that it appeared that
such a sale might be brought about and the stock-
holders receive $250 a share for their stock, Laughlin
drafted the contract of September 1, 1925, and Irwin
signed the same at Laughlin's solicitation; that in the
1st paragraph of this contract appears Laughlin's
written admission of his promise previously given
verbally, viz., ''inasmuch as Laughlin *gave* to Irwin his
verbal promise to divide with him the gains on said
800 shares,'' etc.; that, relying on Laughlin's promise,
Irwin, in accordance with the provisions of said con-
tract, deposited with Holden not only the 800 shares of
stock, which he held as security for Laughlin's in-
debtedness to him of $80,000 under said eight con-
tracts, but also 400 shares of the stock which he (Irwin)
owned in his own right; that after the deal (pending
at the time of the execution of the contract of Septem-
ber 1, 1925) fell through, Irwin did not withdraw the
stock so deposited with Holden, but assisted Laughlin
in finally consummating a sale of the hotel property,
etc., at a lesser price; that when the purchaser (Col-
lins) had paid to Holden the purchase price and Holden
was about to make a distribution of $175 per share
on the stock, Laughlin directed Holden to pay all of
the $140,000 (on account of said 800 shares) to Irwin,
and stated in substance to both Holden and Collins
that Irwin was to receive one-half of the profits over
par on said 800 shares; that Laughlin never stated

or intimated to Irwin, prior to the consummation of the sale to Collins, that he considered his promise to be illegal for want of consideration; that after Irwin had accounted for the proceeds received by him on said 800 shares, on the basis of said promise, and had delivered to Laughlin the check for $10,473.80, Laughlin made no objections to the account or the amount of the check for a period of more than four months; and that Irwin first learned of Laughlin's contention (that his promise was illegal) when the present bill was filed. Had Irwin been informed of this contention or position prior to the signing of the contract of September 1, 1925, he doubtless would not have signed that contract or deposited with Holden the 1,200 shares of stock, or, if later informed, would not have assisted Laughlin in bringing about the consummation of the sale to Collins. These acts of Irwin, as well as many other acts of his as disclosed in the present record, were performed in reliance upon Laughlin's said promise. After the sale to Collins had been consummated Irwin no longer had any control over the 1,200 shares of stock and his situation had been changed. We think that the evidence shows that Laughlin was silent when he should have spoken and that he should be estopped from claiming that his promise is illegal and void for want of consideration. (*Milligan v. Miller*, 253 Ill. 511, 517; 2 Pomeroy's Eq. Juris. 4th Ed., p. 1680, sec. 818; also p. 1642, sec. 804.) The author says (sec. 804): "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract or of remedy."

And we think that Laughlin's counsel's contention (that Laughlin's promise to divide said profits on the 800 shares of stock is so unconscionable and oppressive as not to be enforceable in equity) is lacking in merit in view of the circumstances disclosed. Even if such a promise might under other circumstances be so considered it sufficiently appears that Laughlin knew exactly what he was doing when he made and many times repeated his promise and finally put it in writing; also that he had good and sufficient reasons for making it and repeating it. Furthermore, in the absence of fraud, courts of equity usually enforce agreements which are understandingly entered into. In *Cumberledge v. Brooks,* 235 Ill. 249, 257, it is said: "But the object of courts of equity, as well as courts of law, is the enforcement of contracts understandingly entered into, rather than their evasion. . . . There is no charge or evidence of fraud in the case. The parties were competent to contract, and did fairly contract, with each other, and neither side ought to be relieved from the agreement on the ground that good business judgment was not used in entering into the contract."

Equally without merit, in our opinion, are the contentions of Laughlin's counsel, in support of the assigned cross errors, that the eight contracts are usurious, and that Laughlin is entitled to recover back such portion of the $87,850, paid to Irwin "under the guise of dividends" on the 800 shares of stock, as is in excess of interest at the rate of 7 per cent per annum on said loans, aggregating $80,000, which Irwin made to Laughlin from time to time, commencing in January, 1909, and continuing until November, 1923. In *Clemens v. Crane,* 234 Ill. 215, 229, it is said: "To constitute usury, in contemplation of law, the following essential elements must be present: (1) There must be a loan or forbearance; (2) the loan must be of money or something circulating as money; (3) *it must*

*be repayable absolutely and at all events;* (4) something must be exacted for the use of the money in excess of and in addition to the interest allowed by law." In the last paragraph of the last of the eight contracts (dated November 22, 1923) it is provided: "It is further agreed that in the event Laughlin dies before he redeems other shares by Irwin held for his account on the same or similar terms, Irwin's title to the shares shall thereafter be treated as absolute." It thus appears that the principal of the loans was not "repayable absolutely and at all events," and that such repayment depended upon a contingency, viz., the continuance of the life of Laughlin. Furthermore, the contracts had provisions to the effect that Irwin was to receive the dividends on the stock "in lieu of interest," or that Laughlin was "to pay no interest" on the loans, and the evidence shows that he never made any interest payments. Furthermore it appears that, after the sale of the stock and property of the hotel company to Collins and after Holden had paid to Irwin the $140,000 for the 800 shares of stock, Laughlin considered that his indebtedness to Irwin of $80,000 (evidenced by said eight contracts) was paid. Laughlin testified that, before the distribution of the money received by Holden from said sale, Holden "asked me what to do with the money which those 800 shares represented in his distribution, and I told him *to pay Irwin the eighty thousand that I owed him,* and to allow him to take from the sixty the two notes, one of thirteen thousand and one of five thousand, and Holden did that, and turned the notes to me as vouchers." This transaction and Laughlin's statement to Holden amounted, we think, to a *voluntary* payment of Laughlin's indebtedness of $80,000 to Irwin. And we understand it to be the law that, even where usurious interest payments have been exacted and paid, the voluntary payment of the principal debt by the debtor prevents his recovery back of such usurious payments.

(*Hadden v. Innes*, 24 Ill. 381, 384; *Parmelee v. Lawrence*, 44 Ill. 405, 414; *Mason v. Pierce*, 142 Ill. 331, 336.) Furthermore, inasmuch as the contracts provided that Laughlin should not pay any interest on the indebtedness or that Irwin should receive the dividends on the pledged stock in lieu of interest, Irwin took the hazard that in some years he might not receive either legal or any interest on the loans. There was no certainty that the hotel company would be able to pay dividends every year. In 29 Ency. Law (2nd ed.) p. 486, it is said: "On the other hand, however, if there is a hazard of losing legal interest, the fact that upon the happening of a contingency the lender may receive more than legal interest will not render the transaction usurious." (See, also, *Potter v. President and Fellows of Yale College,* 8 Conn. 52, 62.)

Our conclusion is that the decree appealed from should be modified to the extent of giving to Irwin's executors an additional credit of $30,000 for Irwin's one-half share of the profits on the 800 shares of stock, realized from the sale of the hotel property to Collins in July, 1926. Accordingly, the decree is reversed and the cause remanded, with directions to the circuit court to make modifications therein as follows: In the judgment clause of the decree, wherein the court adjudges that Laughlin have judgment against Irwin's executors for $40,473.80, these figures should be changed to $10,473.80, and, inasmuch as Irwin before the filing of Laughlin's bill tendered said last mentioned sum to him, and during the hearing in the circuit court kept the tender good, the circuit court will not charge any interest against Irwin's executors on said sum of $10,473.80, and will tax all costs against Laughlin. And the costs in this court will also be taxed against Laughlin.

*Reversed and remanded with directions.*