Charles H. Aldrich v. Charles R. Aldrich et al.
Chicago Title & Trust Company, Appellant, v. Charles
A. Brown and William Hardy, Appellees.

Gen. No. 34,385.

334

336

Heard in the first division of this court for the first district at the June term, 1930. Opinion filed March 2, 1931.

MILLER, GORHAM & WALES, for appellant.

JOHN M. ZANE, HAROLD W. NORMAN, WILLIAM J. PRINGLE and ALEXANDER C. MABEE, for appellees.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

I. This is an appeal by the Chicago Title & Trust Company from a decree which adjudged that Charles

A. Brown was the absolute owner of a beneficial one-tenth interest in and to certain property described in a deed of trust dated January 6, 1925, and directed the Chicago Title & Trust Company to pay to him forthwith the sum of $80,333.33 with legal interest from the date of the decree. The material facts are practically undisputed and will be probably best understood if related in time sequence.

Charles H. Aldrich, now deceased, and Charles A. Brown were practicing lawyers at the Chicago Bar, and they were friends of long standing. Aldrich on June 1, 1922, and prior thereto represented the L. P. Larson, Jr. Company in certain litigation with the Wm. Wrigley, Jr. Company, in which the Larson Company claimed that the Wrigley Company had infringed upon certain of their rights and was guilty of unfair competition in the manufacture and sale of Doublemint Chewing Gum. There were two suits pending, and Aldrich represented the Larson Company in both, under an agreement whereby he was to receive as compensation for his services a contingent fee of 33⅓ per cent of the amount which should be recovered. Aldrich, who was devoting practically all of his time to this litigation, was in need of money and approached his long-time friend, Brown, with a view to obtaining financial assistance. On June 1, 1922, they executed a contract in writing, Brown being represented by his banker, Hardy, who executed the contract in his own name but in fact on behalf of Brown, Aldrich having knowledge of that fact.

The contract reciting facts as heretofore stated and the consent of Hardy to furnish financial assistance, conveyed a one-tenth interest in the contingent fee to Hardy (Brown) promised to repay the sums advanced, and a copy of this contract was delivered to the Larson Company which in writing assented thereto. Both of these writings will be set up verbatim hereafter.

On January 6, 1925, Aldrich conveyed all his rights under his contracts with the Larson Company to George F. Porter, as trustee, by a written document which will hereafter require careful consideration and which will then be more fully described. The trustee accepted the trust but thereafter died. The Illinois Merchants Trust Company, successor in trust, declined to accept, and the Chicago Title & Trust Company was by order of court appointed successor to Porter and accepted. This appointment was made upon a bill filed by Aldrich in the circuit court of Cook county in September, 1928, in case No. B167647. Neither Brown nor Hardy nor other parties to whom Aldrich had assigned an interest were made parties.

On November 23, 1923, the litigation between the Larson and Wrigley Companies ended in the U. S. District Court by a decree against the Wrigley Company for $1,384,649.48, and both parties appealed to the U. S. Circuit Court of Appeals.

On November 5, 1928, Hardy assigned his interest, which was only nominal, to Brown, and on December 11, 1928, the Larson-Wrigley litigation was settled by the payment by the Wrigley Company to the Larson Company of $1,900,000. This amount less the sums due to the Larson Company left a balance of $603,333.33, which was paid to the Chicago Title & Trust Company as Aldrich's trustee for the benefit of the beneficiaries.

Brown claimed that one-tenth of that amount or $60,333.33, belonged to him, and that in addition he was entitled to receive back the $20,000 which he had advanced, with interest; and the trustee thereupon set aside a special fund of $89,142.24 as representing the total amount due to Brown. Aldrich, when the litigation was ended and the money in hand, was not so eager to fulfil as he had been to give promises. Differences and disagreements with creditors took place,

and in order that the money might be paid over to the trustee by the Wrigley Company, it was suggested that the parties should submit their claims to arbitration, and such an agreement was drawn up. Its terms also will later require full consideration.

After considerable delay Brown signed the arbitration agreement on January 8, 1929. The arbitration proceedings before Judge Wilkerson opened on February 4. Before the award was made by Judge Wilkerson, namely, on April 13, 1929, Charles H. Aldrich died testate. His will was thereafter admitted to probate. The Chicago Title & Trust Company was appointed as executor and letters issued to that company, and it duly qualified. There were no proceedings before the arbitrator after the death of Aldrich except that on May 11, 1929, Judge Wilkerson made an award. The award found that Brown was entitled to receive on his claim the sum of $26,197.58, representing the sum of $20,000 loaned by Brown to Aldrich and interest at 5 per cent per annum on the amount from the date of the award. The award directed that said sum should be paid to Brown by the trustee from the fund of $89,142.24, represented by the check of the Wrigley Company to the trustee.

Thereafter Brown and Hardy filed their petition in this suit (B167647 circuit court) reciting the transactions as hereinabove set forth, and stating that Brown signed the arbitration agreement upon the full belief that his title by the conveyance to him of a one-tenth interest was not to be affected. The petition averred that the arbitration agreement provided the award should be delivered to the parties and permitted partial awards from time to time; that Aldrich died before any award had been made as to Brown and Hardy. The petition set up the substance of the award and stated that the matter was then pending before the court upon a notice given by the solicitors of the Chi-

cago Title & Trust Company; that the solicitors would ask to have the award approved and an order of distribution made in accordance therewith.

The petition averred that the award was made after the death of Aldrich and that the arbitration agreement in so far as it was not executed or accepted, was thereby revoked; that no lawful award could thereafter be made by the arbitrator and that in any event the award was not to become final until approved by the court; that the right to withdraw from the arbitration on the part of Brown existed until the award became final; that Hardy never agreed to or signed the arbitration agreement; that Brown thereby gave notice of his withdrawal and revoked the power and authority given but requested the court to instruct the trustee to disburse the applicable funds in its hands to the petitioners.

Petitioners prayed that they might be permitted to become parties to the action, without prejudice to their right to object to the trustee's appointment as without jurisdiction as to them; that the appointment of the Chicago Title & Trust Company as trustee should be revoked, and that the sum of $60,333.33 and the further sum of $20,000 should be paid to Brown.

The Chicago Title & Trust Company answered, denying that its appointment as trustee was invalid as to the petitioners; asserted that Hardy had no possible interest in the trust and that the payment of $20,000 to Aldrich by Hardy was actually a loan and the agreement of Aldrich to repay any more than the principal and simple interest of five per cent thereon was usurious, null and void; denied that as executor and trustee it was obligated to pay to Brown more than $20,000 with interest; denied that there could be no matter to arbitrate as to Brown's one-tenth interest; averred that the contract with Hardy, whereby Aldrich agreed to convey to him the one-tenth interest, was contested

on the ground of usury and was null and void; further averred that the amount of $89,142.24 claimed by Hardy or by Brown was incorrect and was not ascertainable until the exact amount due to Aldrich from the Larson Company was determined.

The answer denied that the arbitration agreement was signed by Brown in the belief that his title to his one-tenth interest was not affected or included; averred that Brown was fully and formally advised before he signed the arbitration agreement that the defense of usury would be raised, and that he signed the same knowing that that question would be submitted to the arbitrator; that before the commencement of the arbitration the defense of usury was formally raised in a brief submitted to the arbitrator, a copy of which was served upon Brown's counsel; that Brown made no attempt to withdraw from the arbitration, but that on the contrary his solicitors argued the matter at length and submitted to the arbitrator briefs in which the question of usury was discussed; that at no time did Brown or his solicitors object to the arbitrator considering the question of usury, or any other question connected with Brown's claim; that on the contrary the whole dispute as to his right to receive $80,333.33 claimed by him was fully and frankly submitted to the arbitrator without reservation.

The answer denied that the trustee and executor had taken a position hostile to the interests of the petitioners; stated that it had repeatedly endeavored to effect an amicable adjustment of the dispute between Brown and Aldrich; that there were minors and unborn contingent remaindermen who had interests in the trust; that on their behalf and because of the request of Charles A. Aldrich, and the other principal beneficiaries of the trust that it do so, it deemed it to be its duty to submit to the arbitrator and to the court all the facts in connection with the defenses to the

claim of Brown and Hardy and to take its judgment thereon; that should the court believe that its appointment as such executor in any way was inconsistent with or a drawback to its acting as such trustee, it offered on request of the court to resign as executor and trustee.

The answer admitted that the award was made after the death of Aldrich; denied that that fact in any way invalidated the arbitration or that the arbitration agreement was thereby revoked; denied that the award as to Brown was not to become final until approved by the court, but averred that by its express terms it was final and binding; denied that Brown had any right to withdraw from the arbitration; averred that whereas the award was entered on May 11, 1929, Brown took no steps to attack or disaffirm it until the solicitors for the Chicago Title & Trust Company filed on June 3, 1929, a petition asking to have the award approved. It asked that the prayer of the petition of Brown and Hardy might be denied and dismissed for want of equity.

The cause came on for hearing upon the petition of Brown thereto, the matter was heard by the chancellor in open court and a decree was entered as heretofore stated.

II. It is first contended by the Chicago Title & Trust Company that the award of Judge Wilkerson of May 10, 1929, was binding upon Brown and that it should not have been set aside by the court. The decree adjudged that the award was not binding and that it should be set aside. It is the theory of Brown that the death of Aldrich revoked the submission in the absence of any stipulation that it should survive that event, and such seems to be the general rule as stated in 5 Corpus Juris, sec. 112, pp. 58 and 59:

"As the submission to arbitration confers no more than a naked power, the death before award of a party

to a common law submission has the effect of a revocation of the submission, by operation of law, in the absence of a stipulation that the submission shall survive. However, if the submission expressly provides against a revocation by the death of either of the parties, such a provision is valid and will prevent the death of one of the parties from operating as a revocation. But in order to have this effect, the agreement must be explicit.''

It is contended, however, in behalf of the trustee that the provision of the agreement to the effect that the award shall be delivered to the parties and that the agreement shall inure to and be binding on the heirs, executors, administrators or successors of the parties thereto, has the effect of such explicit stipulation. The trustee also contends that the death of only one of several parties on the same side of the arbitration does not revoke, citing 5 Corpus Juris, sec. 113, p. 59, which states the rule to be:

''Where there are several parties to the submission on one side, it has been said to be extremely questionable whether the death of one of such parties revokes the submission; but it has been held that after the death of one of such parties an award cannot be made in favor of the survivor and the representatives of the deceased party. The surviving parties may continue the arbitration by consent so as to render an award binding between them.'' The authorities cited in this connection are the *Matter of Hare and Milne,* 6 Bingham's New Cases, 158, and *Freeborn v. Denman,* 8 N. J. L. 116.

In the *Matter of Hare and Milne* it appeared that A & B, partners, referred matters in dispute between the partnership and C to arbitration, and the submission provided that if either of the parties died, the award should be delivered to the personal representatives. B died, and C notwithstanding continued the

arbitration but afterwards raised the objection that B's executor was not made a party. The court said: "As a general proposition of law, it is extremely questionable whether the death of one of the parties on one side avoids an award," and overruled C's contention, but apparently put its decision on the ground that the award was in favor of the surviving partner, who would, of course, succeed to all of the rights of the partnership.

In *Freeborn v. Denman,* D & J declared against F, and the cause was referred to arbitration. J died before the report was made, and F objected that the death of J had not been suggested. A statute of New Jersey provided that where there were two or more plaintiffs or defendants and one or more of them should die, if the cause of action survived, the action should not thereby abate, and the court said:

"Inasmuch therefore as one of the several plaintiffs or defendants cannot without the others revoke a submission; inasmuch as one party without the consent of the other cannot rescind a rule of reference; inasmuch as the reference, report and judgment are with us the regular continuance of an action; and inasmuch as the death of one of several plaintiffs or defendants, where the cause of action survives, operates no abatement, there was in the case before us, by the death of Jaques, no revocation of the authority of the referees."

In the instant case Aldrich and the trustee did not have a joint interest. The matter was of an equitable nature, and the controversy, as a matter of fact, was between Aldrich on the one side and Brown on the other. The trust company was a mere stakeholder. The residue of the trust would go to Aldrich or to the estate of Aldrich. Whatever was taken from Brown would be for the financial benefit of Aldrich or his personal representative. The cases cited do not sustain the contention of the trustee. The overwhelming

weight of authority is contrary thereto, as is *Mooers v. Allen,* 35 Me. 276, where a suit was submitted to arbitration, the parties in interest met and continued the hearing, after which the plaintiff died and a plea of defendant in abatement or bar was overruled. But the higher court held that the arbitrators were without authority to proceed. To the same effect are *Power v. Power,* 7 Watts 205; *Farmer v. Frey,* 4 McCord 160; *Tyler v. Jones,* 3 B. and C. 144; 10 Eng. Com. Law Rep. 74.

Nor does the fact that the agreement binds the heirs, executors, etc., take the case without the rule. It was expressly held to the contrary in *Bailey v. Stuart,* 3 Watts and S. 560, where the clause in the arbitration agreement was—

"For the true and faithful performance and of all and singular the agreements and stipulations above mentioned, each binds himself to the other, his heirs, executors, and administrators, in the final sum of $1,000" etc.

The court there said:

"Death is clearly a revocation where there is not an express stipulation that the submission shall survive; as was held in *Rhodes v. Haigh* (3 Dow & Ry. 610) and many other cases. And such a stipulation must be explicit. In *Blundell v. Brettargh,* 17 Ves. 232, the parties had agreed for themselves, their heirs, executors, administrators or assigns, to pay the value of certain property when ascertained by the award of particular arbitrators, delivered to the parties by a day mentioned; and Lord Eldon held that as the delivery was to be to themselves, the true construction of the agreement was that they themselves would do such acts as such be prescribed by an award thus delivered, or that if they happened not to live long enough *after the delivery* to do them in person, then that their representatives would do them in their stead;

not that the binding of their representatives made them parties to the submission. It will be perceived, therefore, that such binding does not extend the duration of the submission beyond the joint life of the parties where the award is to be delivered to themselves; but the law undoubtedly allows it to be further extended by an agreement for the delivery to the parties or their representatives, as in *Tyler v. Jones*, 3 B. & C. 144, S. C. 4 Dow & Ry. 740. But in the agreement before us there is not a word about delivery to representatives; nor is it even provided that they should do an act of performance."

The trustee cites *Clarke v. Crofts*, 13 Eng. Com. Law Rep. 439, where it was held that under the facts the authority of the arbitrator was not determined by the death of one of the parties before the award was executed. In that case a verdict by consent had been entered for the plaintiff, subject to the award of an arbitrator appointed under a rule of *nisi prius*, with power to settle all matters of difference between the parties and to give directions to either party respecting the matters in difference, and the parties expressly agreed to obey the award, so as the arbitrators should publish it in writing, ready to be delivered to the parties, or either of them, "or if either of them should be dead before the making of the award, then to their respective personal representatives who should require the same on or before the fourth day of Michaelmas term then next, or any other day to which the time should be enlarged." The plaintiff died before the arbitrator published his award, and plaintiff's executrix asked the arbitrator to proceed but defendant objected. It was contended for defendant that by the death of the plaintiff the arbitrator's authority was determined, and that at all events he could not after the death enlarge the time for making his award; that no man could so bind himself as to lose the power of re-

voking; citing *Vynior's* case, 8 Rep. 162; that death had always been held a revocation in law of an arbitrator's authority, as marriage was of the authority of a *femme sole;* that circumstances of a party's being engaged by bond or rule of court not to revoke, did not alter the case and that he might still revoke, though subject to an attachment or an action of covenant; that the plaintiff being dead, the parties were no longer on an equal footing; that there was no mutuality between them, and that for that reason the defendant must be esteemed as released. But it was pointed out in behalf of the executrix that while the arbitrator's authority was no doubt revoked by death, the defendant had bound himself by rule of court, and that he could not refuse to perform that which he had consented to perform by the rule of court; that such was the general understanding of the courts was apparent from the clause universally introduced in the rule of *nisi prius* that in case of the death of either of the parties the award should be delivered to the personal representative.

The court by Chief Justice Best stated that while the general rule of law no doubt was that the death of one of the parties before the award, was a revocation of the arbitrator's authority; that general rule might be guarded against by contract, and that the real question in the case was whether the defendant had done so. After reviewing the authorities the court said that the direction for the delivery of the award to the representatives of either of the parties would be nugatory, if the death of the parties were to suspend the operation of the rule; that there was under the facts an implied undertaking by the parties to bind their personal representatives to accept the award, and that there was no law to prevent it; that therefore the parties were bound. Judge Park said that the clause for the delivery of the award to the ex-

ecutors of either party was introduced into *nisi prius* orders "to obviate the inconvenience that would otherwise arise upon the occurrence of a death." Burroughs said that there might have been more color for this objection if a verdict had not been taken in favor of the plaintiff. Judge Gaselee said that it was clearly laid down by the cases "that the death of either of the parties does not determine the arbitrator's authority under a rule which authorizes him to deliver his award to the executors of either party, if either shall die before the award is made."

There is in the instant case, of course, no such rule, nor does the arbitration agreement contain a provision that the award may be delivered to the personal representatives of the parties, nor is there any reference to the contingency of the death of either of the parties. As attorneys for Brown point out, such a clause is usual in most of the arbitration forms, and the fact that this agreement seems to have been prepared by Aldrich and his counsel would justify the inference that the omission of any provision with reference to the death of either of the parties was intentional. The reason the death revokes an arbitration agreement is that the agreement confers a naked power without an interest, and such a power is always revoked by the death of one of the parties.

The trustee, however, invokes the principle of estoppel. It says that Brown took the benefit of the arbitration and should not now be permitted to repudiate it; that the Larson Company claimed that under its contracts with Aldrich it had the right to deduct one-third of the expenses of the litigation with the Wrigley Company from the share which Aldrich was to receive; that this amounted to the sum of $23,467.73, and that if Larson's contention prevailed Brown's 10 per cent interest would have been reduced by $2,346.77; that the arbitrator decided this dispute in favor of Aldrich

to the benefit of Brown in this amount. A letter from Brown to Aldrich seems to refer to a contention of this character, but apparently Brown at that time overlooked the fact that his assignment from Aldrich provided that $30,000, and no more, should be deducted for that purpose. It would appear, therefore, that there is no basis for an estoppel as against Brown on that ground.

Again, it is urged that Brown waived his rights by delay in his attempt to revoke. Aldrich died April 13, 1929, and Brown had notice thereof within a week thereafter. The award was handed down May 10. On June 14 thereafter, Brown filed his petition with the circuit court, praying that the award might be set aside. The trustee says that Brown was waiting to see what the award would be, and it is urged that he should not be permitted to experiment with the arbitration proceeding. The trustee cites *Seaton v. Kendall*, 61 Ill. App. 289, where a party who tried to avoid the award on the ground of misconduct of the arbitrator was held to have waived the objection by participating in the final hearing and finding without protest. The case is not applicable to the facts here. Brown, so far as the evidence discloses, did not take any part in the arbitration proceeding before Judge Wilkerson after the death of Aldrich. Brown was under no particular duty requiring any affirmative action on his part, if the death of Aldrich revoked the submission, as we hold.

Brown, however, further contends that under the arbitration agreement the award was to be in no event valid until confirmed by the court, and since the court did not approve Brown is not bound by the award. The decision of that question depends upon the intention of the parties to the agreement as expressed in it. On that point the agreement was, "The parties hereto agree each with the other to stand to, abide by, perform, fulfill and keep the said award or awards as

to the said several controversies and disputes so to be made and published as aforesaid, and to accept the decision and determination of said arbitrator as to each of said controversies and disputes without recourse to any further proceeding at law or in equity. . . .''

In the following paragraph the trustee agrees that it will ''immediately by petition or by other proper proceeding, submit such award or awards of said arbitrator to the circuit court of Cook county in said cause entitled, 'Aldrich vs. Aldrich et al.,' number B–167647, in equity, praying and asking the court to approve such award or awards,'' and after further providing that on the failure of the trustee so to do any other party interested might so petition the court, the paragraph concludes: ''And any such award or awards, including payments and disbursements to be made thereunder, before they shall be binding upon the trustee, shall be so approved by said court.''

We think this last provision must be construed as for the benefit only of the trustee, otherwise it would be inconsistent with the preceding paragraph which makes the award final and binding upon all the parties upon the rendition of the same. It is perfectly apparent why the trustee would insist upon this provision in its favor. Infants were beneficiaries of the trust which was imposed upon it, and it could not abdicate its position as trustee in favor of an arbitrator, but there is no reason why the beneficiaries who were not under disability could not submit their own rights to arbitration without any such limitation. The language of the arbitration agreement indicates that it was the intention of Brown to be bound and to abide thereby without further resort to law or equity. Manifestly, the trustee under the circumstances could not so agree, and the last clause therefore created an exception in its favor. Brown entered into the agree-

ment with knowledge of the trustee's incapacity in this respect, and he was therefore bound. He was in the same situation as if he had agreed to arbitrate directly with an infant, in which case, according to the better authority, having knowledge of that fact prior to making the agreement, he would be bound. *Dowse v. Coxe,* 11 Eng. Com. Law Rep. 20. In this connection, attorneys for Brown present a vivid picture of the Ancient Mariner approaching Scylla and Charybdis, and state that if Brown was bound and the trustee was not bound, then the arbitration agreement was void for want of mutuality. We are cited to a number of authorities which it is claimed sustain this contention. We are not able with the judicial eye to discern either the rock or the whirlpool which the pilot describes. The cases cited do not sustain the contention. One of these is *Ingraham v. Whitmore,* 75 Ill. 24, which concerned a parole agreement for submission, and the opinion of the court states the elementary rule that the promises in an agreement of that kind must be concurrent and mutual. As a matter of fact, the case was decided against the award, on the ground that a broker had no power to submit for his principals and there was also misconduct on the part of the arbitrator. Another is *Keep v. Goodrich,* 12 Johns. 397, where an arbitration was held invalid because the facts showed that at no one point of time did both parties bind themselves by an agreement with each other. Yet another case is *Yeamans v. Yeamans,* 99 Mass. 585, where the defendant undertook under the submission to do a thing which he was not legally competent to perform, and it was held that as he was not bound neither was the other party and the award was held void. We are also referred to *Biddell v. Dowse,* 6 B. and C. 255, where the attorneys for the parties made a submission, some of the plaintiffs being infants, others married women who joined with their

husbands, and others *sui juris*. Defendants were all adults. The court said that the infants could not have an attorney either in or out of the suit, and it was questioned whether the next friend of the infant could be bound themselves by the attorneys. There was no showing that the next friend assumed the obligation to perform, and the court said that the agreement was therefore not mutual and was void, following Lord Nottingham in 1 Cha. Ca. 279.

Another case is *Marsh v. Wood*, 9 B. and C. 659, where it appeared that after an agreement to arbitrate, one of the parties, Rowe by name, became bankrupt and assigned first to the provisional assignee and then to the plaintiffs. Plaintiffs revoked their submission. Judge Tenterden said that it was not necessary to decide that bankruptcy in general revoked a submission to arbitration because all the bankrupt's interest had passed to the assignees, who would not have been bound by the submission, and that therefore defendants ought not to be bound.

Without undertaking to discuss these opinions further in detail (all of which are distinguishable) we hold the modern and better view well stated in 5 Corp. Jur., sec. 356, p. 148:

"In an early English case, where the award affected a person under disability, the award was held invalid for want of mutuality because such party could not be bound thereby, and this principle has been applied in a later case. But where the opposite party enters into such a submission knowingly, the courts at the present time are disposed to uphold the award. So also where a submission to arbitration is made by an unauthorized agent, the award, not being binding upon the alleged principal, has been said to be invalid for want of mutuality, and unenforceable by the principal."

It is not necessary to the mutuality of a contract (where the consideration is a promise given for a

promise) that the promises must be exactly of the same kind and nature. Here the promise of Brown was to abide by the award absolutely. The promise of the trustee was that it would submit the award to the court and if the court approved, that it would abide by it. The promises were mutual and binding upon all the parties.

In behalf of Brown a large number of cases are cited to the proposition that a common law agreement to arbitrate is revocable until the award becomes final. *Paulsen v. Manske,* 126 Ill. 72; *Gregory v. Pike,* 94 Me. 27, 46 Atl. 793; *Farmer v. Frey,* 4 McCord, 160; *Boyd v. Bargagliotti,* 12 Cal. App. 228, 107 Pac. 150; and *Mason v. Bullock* (Ala.), 60 So. 432, are the cases cited. These cases so hold but have no application here, because Brown did not, prior to the delivery of the award, attempt to revoke. However, for the reasons already stated we are of the opinion that the death of Aldrich revoked the arbitration agreement; that Brown did not waive his rights to insist on such revocation; that he is not estopped in any way to take the benefit of the revocation, and that the circuit court of Cook county was not bound in considering his petition to regard the award as valid and conclusive.

III. It therefore remains to consider whether the agreement between Hardy and Aldrich was or was not usurious. Brown insists that it was not, and the trustee affirms that it was. Both parties cite and rely on *Clemens v. Crane,* 234 Ill. 215, in which the court said:

"Usury is defined to be an illegal profit required and received by a lender of a sum of money from the borrower. (Blackstone, 156; Bouvier's Law Dict.) To constitute usury, in contemplation of law, the following essential elements must be present: (1) There must be a loan or forbearance; (2) the loan must be of money or something circulating as money; (3) it

·must be re-payable absolutely and at all events; (4) something must be exacted for the use of the money in excess of and in addition to the interest allowed by law.''

The court further states that some decisions appear to imply that a fifth element should be added, namely, that of the intention of the parties or at least of the lender; but that in the opinion of the court it was quite as accurate to say that the intention of the parties, as the same appears from the facts and circumstances of the case, might be considered in connection with other evidence in determining whether the essential elements of usury were present.

The parties seem to agree also that if an agreement can reasonably be construed as non-usurious, it should be so construed. *Mosier v. Norton,* 83 Ill. 519; *Mumford v. Tolman,* 157 Ill. 258, together with the *Clemens* case already considered, are cited. It is elementary that usury is an affirmative defense which must be pleaded and proved by the party relying on it, but the law is diligent to discern any artifice, devise or scheme to cover up usury, and verbal evidence is always admissible as against the writing of the parties to establish such fact.

The parties here appeal to the language of the contract, and it seems desirable to set it up verbatim:

''THIS AGREEMENT between CHARLES H. ALDRICH, party of the first part, and WILLIAM HARDY, party of the second part, WITNESSETH:

''The first party has two certain contracts with the L. P. Larson Jr. Company covering his services for the prosecution of certain litigation between that company and the Wm. Wrigley Jr. Company, the first of which bears date of March 18th, 1914, and the second July 12th, 1915, true copies of which are attached hereto and made a part hereof, and has sought financial aid from the second party hereto to enable him to devote a large amount of time to such litiga-

tion now pending in the United States District Court for the Northern District of Illinois, Eastern Division, and on reference before Charles B. Morrison, Master in Chancery, to ascertain the profits arising or accruing to the Wm. Wrigley Jr. Company from July 28th, 1914, to November 12th, 1918, from the manufacture and sale of Doublemint Gum in its infringing dress under the terms of a decree entered in said cause on the 14th day of October, 1918; and also an action for damages brought against the Wm. Wrigley Jr. Company, filed on the 29th day of March, 1917, in said District Court of the United States for the Northern District of Illinois, Eastern Division, and yet pending and undetermined; which financial assistance the second party has consented to furnish.

''In consideration of which undertaking on the part of the second party hereto, and the keeping of the covenants herein contained on his part to be kept and performed, the first party hereto sells and assigns to the second party hereto an undivided one-tenth interest in and to said contracts and all his rights thereunder, and covenants and agrees that the second party hereto shall realize thereon from the decree or any settlement of the matters in controversy between the L. P. Larson Jr. Company and the Wm. Wrigley Jr. Company not less than the sum of fifty thousand dollars ($50,000) and as much more as said ten per cent interest would entitle the second party to in the event of payment or a settlement for more than $1,590,000.00.

''The first party is indebted to the Larson Company in an amount not exceeding thirty thousand dollars ($30,000) with interest at the rate of six per cent per annum from the date of each advancement, this assignment of interest is made subject thereto.

''The one-tenth interest so assigned is in addition to the re-payment of the amount advanced by the second

party hereunder, which is to be repaid by the first party when payment or settlement is made.

"In consideration of which assignment of interest the second party hereto covenants and agrees to pay to the first party hereto upon the signing of this agreement, the sum of $5,625 and the further sum of $625 on the first day of each and every. month until and including May 1st, 1924, unless the said litigation is concluded or settled between the parties thereto prior to the last date named; it being mutually understood and agreed that the monthly payments herein provided shall cease when settlement is made, and that this contract shall be construed as authority and direction to the L. P. Larson Jr. Company to pay the amounts to be paid hereunder by the party of the first part, from and out of any payment by the Wrigley Company under any decree or settlement as and when made, and that this contract shall be deemed an assignment of the one-third interest of said party to the extent herein stated, subject to the indebtedness of said first party to the L. P. Larson Jr. Company and the duties and obligations of the said first party to said company to be kept and performed.

"This contract shall be obligatory upon the heirs, representatives and assigns of the respective parties hereto.

"In Witness Whereof we have executed this agreement this first day of June, A. D. 1922.

Charles H. Aldrich<br>William Hardy."

An examination of the instrument discloses that nowhere in it is the word "loan" used. The act of providing the money is designated an "advancement," which, while it ordinarily has a different meaning, might, of course, mean the same thing as a loan. *Schlesinger v. Burland,* 85 N. Y. S. 350; *Tyson v. School Directors,* 51 Pa. 9; *Laflin & Rand Powder Co.*

*v. Burkhardt*, 97 U. S. 110. The writing first recites the circumstances that have given rise to the transaction. These, in short, are the necessities of Mr. Aldrich. These appear not alone from the writing but also from the testimony as to the preliminary oral conversations. The second part of the writing conveys to Hardy (in reality, Brown) an undivided one-tenth interest in the contracts between Aldrich and the Larson Company, and in this connection appears the covenant and promise by which Aldrich agrees that Hardy (that is, Brown) shall realize thereon not less than the sum of $50,000 and as much more as the 10 per cent interest would entitle the second party to in the event of payment or settlement for more than $1,590,000. All of these by the third clause are made subject to an indebtedness of Aldrich to the Larson Company for an amount not exceeding $30,000 with interest, at the rate of 6 per cent per annum. By the fourth clause it is provided that the one-tenth interest shall be in addition to the repayment of the amount advanced by Brown thereunder which included $5,625, presently paid, and that $625 shall be paid on the first day of each and every month until and including May 1, 1924, unless before that time the litigation is concluded or settled.

It is significant that the agreement does not provide for interest on the amount to be advanced, nor is the amount advanced referred to as an indebtedness. Both terms are used with reference to the obligation of Aldrich to the Larson Company which is therein described.

The first controversy between the parties in construing this contract concerns the question of whether the money to be repaid to Brown was an absolute obligation or only a contingent one. As to the amount of money which Brown or Hardy actually advanced to Aldrich, we think there can be no question. The writ-

ing says it is to be repaid by the first party, i. e. Aldrich, "when payment or settlement is made." Payment by whom? Evidently, first by Wrigley to Larson and afterwards by Larson to Aldrich. Would Wrigley ever pay? Presumably not, unless he had to. Who could tell him that he had to? Manifestly, the court or courts in which the litigation was or should be pending. Would the court so direct? Not until a decision in Larson's favor should be rendered. Would the decision be in favor of Larson? Maybe so, maybe not. Few things in this world are more uncertain and dubious than the result of a law suit. The uncertainty could not be removed by anything that Aldrich could do. He could not purchase a decision. Again, the writing provides that Aldrich is obligated to repay Brown in case of a settlement. Aldrich could advise his client to make a settlement. He could not force a settlement unless and until both Larson and Wrigley would agree thereto. The repayment to Brown by Aldrich would therefore depend upon contingencies over which Aldrich did not have control. Since the repayment depended upon such contingencies, there could be no absolute obligation so far as Aldrich was concerned.

But it is argued that the provision of the agreement that Brown, or Hardy, shall realize $50,000, created an absolute obligation against Aldrich. If we look closely at that agreement, however, it appears that the agreement is limited by the clause, "from the decree or any settlement." "Decree or settlement" is somewhat different from "payment or settlement." What is the meaning of the word "decree" in this connection? On a liberal construction it would mean that the order or judgment by which the court would finally dispose of the issues of the case. Obviously, the sum of $50,000 or more would not become due unless and until the decree would be entered. When would that

be done? Sometime, it may be presumed, but at what time? A most indefinite one. As a matter of fact, years intervened. There were any number of contingencies which might have indefinitely postponed the entry of that decree. We have already pointed out the indefinite and contingent nature of the obligation to pay upon settlement. That time was, of course, wholly contingent. The probabilities are that the parties to the agreement did not distinguish between the words "decree" and "settlement," and that the kind of a decree in the minds of the parties was one that should be favorable and under which Larson should recover.

Of course, the trustee contends, as it must, that the covenant and agreement of Aldrich was that upon the entering of a decree Brown, or Hardy, should receive at least the sum of $50,000. It would require a quite liberal interpretation of that clause to so construe its meaning. If it was the intention to assume a personal obligation, it would seem strange indeed that the parties to the agreement, both of whom were lawyers, would not have seen to it that unambiguous language was used. Manifestly, the clause is capable of two constructions. It may be held reasonably to mean that Aldrich covenanted and agreed that Brown, or Hardy, in case of a settlement for an amount of less than $1,590,000 should notwithstanding receive at least $50,000 of the amount actually recovered. It might have been intended (but this seems very improbable) to express the personal obligation of Aldrich to see to it that at all events and absolutely that Brown, or Hardy, at the end of this legal excursion should have at least $50,000. It is hardly possible that such was the actual intention of the parties under all the circumstances. In the first place, Aldrich himself was financially irresponsible. The very fact that he was peddling partial assignments of a contemplated fee,

which apparently no one expected would be earned or
obtained for many years, if ever, would indicate that.
Why take the personal obligation of Aldrich that he
would pay in case he lost the litigation, which he was
conducting on a contingent fee and which if he lost
would leave him penniless? In the next place, the
Larson Company became a party to the agreement at
the time it was made, and by a writing upon the
contract its construction thereof, as well as that of the
original parties thereto, appears, as follows:

"The L. P. Larson Jr. Company has received a copy
of the above and foregoing contract between Charles
H. Aldrich, as party of the first part, and William
Hardy, as party of the second part, with attached ex-
hibits, and will under the terms thereof pay to the
party of the second part, from any funds accruing to
Charles H. Aldrich, or to his estate, pursuant to the
provisions of said contract and under the terms of the
original contracts between said Charles H. Aldrich
and this company, as therein provided, the amount to
which said second party is entitled."

It therefore appears from this contemporaneous
construction of the contract that the parties were all
agreed that it was to be satisfied out of moneys which
should become due to Larson from Wrigley and there-
fore due from Larson to Aldrich or to his estate. By
the same agreement the Larson Company made pro-
vision that in the event of the death or disability of
Aldrich before the completion of the litigation, some
suitable attorney should be selected acceptable to the
Larson Company, who would carry the case through
to completion, the reasonable expense of which should
be charged against the estate of Aldrich, another
contingency which, it would seem, made the obligation
to Brown, or Hardy, yet more contingent. There is
also the further significant fact that during all the
years after Brown, or Hardy, advanced the money

and while the litigation was pending and up to the time of settlement, none of the parties treated any of these obligations as if they represented loans that should be repaid at all events. There was no demand for interest, although after the dispute arose between Aldrich and his old friend Brown, it seems that Brown, either intentionally as the attorneys for the trustee argue, or by mistake, induced thereto through the art of Aldrich (as Brown's counsel plausibly contends) made a demand for interest on the $20,000 which was actually advanced. The contract, however, does not provide for it, and clearly under its terms Brown is not entitled to it, although the arbitrator, proceeding upon the theory that the contract was usurious, allowed interest thereon, which he might properly do upon equitable principles. The general rule of law undoubtedly is that an assignment of a chose in action, accompanied with a collateral warranty of its value, is not usurious, for ordinarily there can be no usury in the conveyance of the obligation of a third party (3 Williston on Contracts, sec. 1689), and a lender who takes the chance (other, of course, than through death or insolvency) of losing his principal is not held to be guilty of usury in case he charges more than the rate of interest which the statute allows. Thus in *Stevenson v. Unkefer,* 14 Ill. 103, a note, payable in Baltimore bank notes, with interest at 12½ per cent per annum, was held not usurious, the lender being paid simply for the risk he took of losing the debt, and a contract may create a contingent obligation without using the actual words ordinarily used to express that fact, such as "proviso" and *"ita quod," "sub conditione," "si," "contingat."* Indeed the word "when" here used has been held by high authority to import a condition. 2 Williston on Contracts, 671.

The trustee, however, cites a line of cases holding that where the time for payment or performance is not

actually fixed by the words of the contract, the law will imply the performance of the condition within a reasonable time, such as, *Nunez v. Dautel*, 19 Wall. 560, where one of the parties contracted to pay ''as soon as the crop can be sold or the money raised from other sources,'' and other cases where it was provided for ''payments when convenient,'' as in *Noyes v. Barnard*, 63 Fed. 782, 788; *Hood v. Hampton Plains Exploration Co.*, 106 Fed. 408, 411; *Nease v. Coal & Coke Ry. Co.*, 195 Fed. 987; *Pritchard v. McLeod*, 205 Fed. 24, 27. In *Sears v. Wright*, 24 Me. 278, the payment was conditioned to be made ''from the avails of logs bought of M. when sale is made.'' In all these cases the court held the true meaning to be that payment should be made within a reasonable time. We do not, however, regard these cases as applicable here. They are all distinguishable in the fact that the contingency which it was held must be performed within a reasonable time, was within the power of the particular defendant to perform. That is not the case here. Aldrich had no power to make Wrigley settle with Larson, and the entry of a decree was not within the control of Aldrich. As the contingency was one not within the control of Aldrich, the law would not imply any obligation on his part to bring it about within a reasonable time. There is a wealth of authority to the effect that money advanced with an agreement to return it upon an uncertain contingency cannot be a usurious transaction. In *Josevig-Kennecott Copper Co. v. Howarth Co.*, 261 Fed. 567, one party agreed to advance $10,000 to be used in the exploitation of a copper mine, he to receive 25 per cent per share of stock sold to be set aside for the repayment of such advances. The party advancing was to receive 2,600 shares of promotion stock, it being also provided that if the sale campaign was unsuccessful, there would be no obligation to repay the advancement, and

it was held that the rule against usury was not applicable to a transaction in which the lender risked loss of capital in whole or in part.

In *Goodrich v. Rogers,* 101 Ill. 523, a party advanced capital to another to carry on business in the name of the party advancing the money. The party to whom it was advanced was to receive $50 a month and each of the parties to the agreement was to receive one-half of the net profits, subject to losses. It was held that this transaction was not usurious. In *Orvis v. Curtiss,* 157 N. Y. 657, the parties, who were stock-brokers, entered into a joint agreement for the purpose of purchasing and carrying certain capital stock of the American Cotton Oil Trust. The agreement provided that a joint account should be opened; that plaintiff and defendant should be equally interested; that the account might purchase or sell upon their joint order to a limited amount, the defendant to furnish to the firm such sums of money as might represent the difference between the price paid for the stock and 45 per cent of the par value. The plaintiff guaranteed that the account should be carried for the period of six months from date and agreed to furnish $4,500 for each 100 shares (the account to be closed and settled in full before July 3, 1887), and to set aside the necessary money to pay for the stock whenever called upon for that purpose, plaintiff to receive interest at 6 per cent from the date of the agreement and broker's commissions on each transaction. The net profits were to be equally divided. Defendant, however, guaranteed that the share of the profits of the plaintiff should not be less than $5,000, and that when the account was closed he would pay over and make good to the plaintiff any deficiency, so that the plaintiff should within six months from the date of the agreement receive either from the account or from the defendant as guarantor not less than $5,000. The

court said that usury must be founded upon a loan or forbearance of money; that there must exist in fact or in law a corrupt purpose or intent to secure an illegal rate of interest for such loan or forbearance; that it must appear that the real purpose of the transaction was on the one side to loan money at usurious interest, and on the other to borrow upon usurious terms. The court further said that defendant's purpose was not to borrow money but to deal in stocks; that there was nothing in the case to warrant the assertion that the plaintiff intended by entering into the transaction to lend money to the defendant in the sense in which such transactions were commonly understood; that it may have been a hard or unconscionable bargain, but whatever else might be said about it, the usury statute had no application to it whatever. To the same effect are *Ordway v. Price,* 156 Minn. 160, 194 N. W. 321, and *Curtis v. LeMoyne,* 248 Ill. App. 99. Following these authorities, we hold that the transaction here was not tainted by usury.

Moreover, Brown contends that since the evidence shows that Aldrich drew the contract the defense of usury may not now be alleged by him, or those in privity with him. He says that Aldrich knew the law as to usury and urges that the ancient maxim of the Roman Law, *Nemo allegans suam turpitudinem est audiendus,* is applicable. *Davis v. Brown,* 94 U. S. 432, is cited. The maxim, as that case shows, does not state a rule of evidence but rather concerns supposed rights based on illegal or criminal considerations. Obviously, it has no application to the facts of this case.

It is true, as Brown contends, that a contract usurious upon its face can be shown by other evidence not to be usurious. Evidence as to that was received, and its admission approved in *Clemens v. Crane,* 234 Ill. 215; *Orvis v. Curtiss,* 157 N. Y. 657; *Embola v. Tuppela,* 127 Wash. 285, 220 Pac. 789; *Ordway v.*

*Price,* 156 Minn. 160, 194 N. W. 321. There is no doubt that the ·rule with reference to contracts in general is that such evidence is not admissible unless there is an ambiguity in the contract, as was held in *Rosenbaum Bros. v. Devine,* 271 Ill. 354, on which the trustee relies; that evidence of a party stating his own understanding as to the effect of a document (*Phares v. Barber,* 61 Ill. 271), testimony of a party as to a secret and unexpressed intention with reference to letters which he has written (*Brant v. Gallup,* 111 Ill. 487), testimony of a party as to what he meant by expressions he used in his letter (*Flower v. Brumbach,* 131 Ill. 646), are inadmissible, but evidence as to the position of the contracting party which tends to throw light upon the intention and evidence of a construction of a contract adopted by the parties, where its terms are uncertain or doubtful, are admissible, as in *Gillett v. Teel,* 272 Ill. 106, which is cited by the trustee.

All the circumstances in this record tend to disprove the alleged usury. No one can read the record without coming to the conclusion that everyone connected with the matter understood that Brown was risking every dollar he advanced to Aldrich and that his only hope of getting any part of it back was based alone upon the contingencies, first, that Larson should win the law suit, and, second, that the decree entered would be for an amount large enough to cover prior encumbrances as well as Brown's claim. The fifth finding of the decree is:

"That at the time of entering into said agreement neither of the parties thereto, said Brown or Hardy, nor said Aldrich intended or purposed that said agreement should be usurious, nor intended it to be a cover for usury, nor was said agreement in any respect usurious; that at the time of the making of said agreement said Brown and Aldrich had been and were close friends and that at the time of the making of said

agreement said Brown and said Hardy knew that said Aldrich was financially irresponsible, and all the parties thereto expected and intended that the sole chance for reimbursement of said Brown for his advances contracted for was the realization of said contingent fee.''

Nowhere in the briefs is this finding of the decree challenged as being contrary to the manifest weight of the evidence, and clearly without such a finding on the part of this court we are bound by it.

Again, Brown makes a much more weighty contention, namely, that the trustee may not plead usury by reason of the terms of the trust which it has accepted; that usury was also precluded by reason of the acceptance whereby the Larson Company was substituted for Aldrich as Brown's paymaster and also by the very terms of the deed of trust.

We have already pointed out the terms of Larson's acceptance of the assignment by Aldrich and set it forth verbatim. Brown's contention is that by this acceptance Larson became the obligor, having assumed and taken the place of Aldrich, and cites as applicable *Gray v. Bever,* 122 Ill. App. 1, where Owens owed Gray, Sr. Gray, Sr., gave to his son, Gray, Jr., an order on Owens for the sum due. Gray, Jr., took the order and Owens promised Gray, Jr., to pay it. Bever tried to reach the debt in the hands of Gray, Sr., by garnishment. This court held that Gray, Jr., was the equitable owner; that there was a contract by novation. , It was objected that the obligation was an entirety, but the court said that while Owens might have raised that question he had not raised it and that Bever could not. To the same effect are *Carlyle v. Carlyle Water Works,* 140 Ill. 445; *Townsend v. Gregory,* 132 Ill. App. 192.

In *Union Nat. Bank v. International Bank,* 123 Ill. 510, it was held that the defense of usury was personal and could not be raised by any other than the debtor

or one in privity with him. To the same effect are *Mason v. Pierce,* 142 Ill. 331, and *Pegram v. Miser,* 176 Ill. App. 352. In *Tyler v. Massachusetts Mut. Life Ins. Co.,* 108 Ill. 58, it was held that a debtor who permitted mortgaged property to be sold for a usurious debt was estopped afterwards to question the debt. In *Essley v. Sloan,* 116 Ill. 391, it was held that the question of usury between the original mortgagor and mortgagee could not be raised by the purchaser of the equity of redemption.

It would therefore appear that through the acceptance of the assignment by Larson a novation was constituted which precludes and estops the parties here who seek to raise the question of usury. The cases to which we have just called attention are cited in the brief of Brown, and a careful perusal of the reply brief of the trustee fails to disclose any discussion of them.

Of the same nature is the claim which is equitable rather than legal in its nature, that the trustee is precluded from raising the question of usury by the terms of the trust under which it acts. The instrument by which this trust was created is in writing and signed by Aldrich. It recites the contracts with Larson, the transactions with Hardy, with Reed, with Sharpe, states that the grantor's desire is to make provision for his three children, appoints Porter as trustee and Illinois Merchants Trust Company as successor, with power to negotiate any settlement or arrangement with the Larson or Wrigley Company, and assigns the contracts with Larson to Porter as trustee and Illinois Trust Company successor in trust "for the following uses and purposes, to wit." One of these purposes is stated to be "to pay the debts now against said contracts above recited." Brown says that Aldrich by the execution of this trust deed recognized the obligation now claimed to be usurious and thereby put the whole matter out of his power forever. He

cites a case, namely, *Chapin v. Thompson,* 89 N. Y. 270, of which a careful examination has compelled the opinion that it is conclusively in favor of his contention.

In that case Thompson executed a bond and mortgage and thereafter made a joint assignment for the benefit of creditors of all his property "in trust, etc., to pay and discharge all the debts," etc. In the schedule of his creditors was inserted the name of the holder of the bond and mortgage. The trustee accepted the trust, the mortgagee brought foreclosure proceedings, and Thompson attempted to interpose the defense of usury. In disposing of that defense the court said:

"The right of the debtor to resist an action upon his obligation is not denied. But the result of establishing a trust was to convert the creditor into a *cestui que trust* and give him rights against a trust fund, which as a simple contract creditor he did not possess, and which did not belong to that relation—rights not to be enforced against the debtor, but the trust property, and adhering to that property until the debt is satisfied, or the property applied upon it according to the terms of the trust; and so long as any debt named by the creditor of the trust remains unpaid, no part of the proceeds of that property can be applied, except to its payment, without a plain violation of the trust declared by the assignment. . . .

"The assignee does not take by contract or agreement with the debtor, but by appointment. As the parties cannot change the terms of the instrument, they cannot withdraw the property or the trusts from the jurisdiction of the court, nor absolve the assignee from its control. If he resigns the assignor cannot appoint a successor. The appointment must be by the court. The execution and delivery of the instrument excludes the grantor from any further dominion over it or its subject-matter.

"Nor is it within the statute which avoids contracts or securities by reason of usury . . . for it is 'a mere trust or appropriation of property made by the debtor, without the agency of the creditor, subsequent to and independent of the usurious contract as a means of satisfying the debt after it has been incurred.' "

To the same effect are *Stanton v. Knight*, 1 Simmons 482; *Wilkinson v. Dodds*, 1 Johns. Cas. 158; *Murray v. Judson*, 9 N. Y. 73. These cases, also cited in the brief of Brown, do not receive attention from the trustee in its reply brief. They seem conclusive. Our conclusion therefore is that even conceding the agreement to be usurious, the parties to this contention are estopped from so contending.

It is also urged that the agreement, if not usurious, is champertous. This contention cannot be sustained, in our opinion. The cases cited by the trustee (*Newkirk v. Cone*, 18 Ill. 449; *Park Commissioners v. Coleman*, 108 Ill. 591) are to the contrary; but if it is champertous, for the reasons set forth concerning the defense of usury, the parties are in no position to raise the question. *Chapin v. Thompson*, 89 N. Y. 270.

For the reasons indicated the decree of the trial court is affirmed.

*Affirmed.*

O'Connor and McSurely, JJ., concur.